**Lillian J. Del Carmen FRANCO–DE JEREZ, et al., Plaintiffs, Appellants,**

**v.**

**Filomeno BURGOS, Defendant, Appellee.**

**No. 88–1918.**

United States Court of Appeals, First Circuit.

Heard April 6, 1989.

Decided June 2, 1989.

Maria H. Sandoval, Isla Verde, P.R., with whom Jose E. Fernandez–Sein and Law Firm of Nachman & Fernandez–Sein, Santurce, P.R., were on brief, for appellants.

Lydia Pelegrin, Asst. U.S. Atty., with whom Daniel F. Lopez–Romo, U.S. Atty., Hato Rey, P.R., was on brief, for appellee.

Before CAMPBELL, Chief Judge, BREYER and SELYA, Circuit Judges.

BREYER, Circuit Judge.

Lillian Franco de Jerez, a citizen of the Dominican Republic, claims that Filomeno Burgos, an immigration inspector, deprived her of her "liberty" without "due process of law." *See* U.S. Const. amend. V; *Bivens v. Six Unknown Federal Narcotic Agents*, 403 U.S. 388, 397, 91 S.Ct. 1999, 2005, 29 L.Ed.2d 619 (1971) (plaintiff may sue federal officers for violation of constitutional rights); *Davis v. Passman*, 442 U.S. 228, 248–49, 99 S.Ct. 2264, 2278–79, 60 L.Ed.2d 846 (1979) (plaintiff may bring *Bivens* action for Fifth Amendment violation). Her complaint, read together with the record, says that:

a. She arrived at the Puerto Rico airport from the Dominican Republic on October 1, 1985.

b. Officers of the Immigration and Naturalization Service (INS) would not permit her to enter the United States.

c. She remained in the airline's custody overnight.

d. On October 2, Inspector Burgos examined her Dominican passport and visa, questioned her, and said he thought her passport had been altered. He brought her before a magistrate for an initial appearance, *see* 8 U.S.C. § 1357(a)(4) (immigration officers may make arrests for felonies under the immigration laws, and bring the person arrested "before the nearest available officer empowered to commit persons charged with [federal] offenses"). Burgos then asked the United States Attorney to file a criminal complaint against her for altering admission documents, or using altered documents, in violation of 18 U.S.C. § 1546.

e. On October 2, later in the day, U.S. Marshals took her to a Salvation Army detention facility, operated by the INS, where she was held incommunicado for nine days.

f. On October 10, Burgos testified before a federal grand jury. As a result of his testimony, Franco was indicted for violating 18 U.S.C. § 1546.

g. On October 11, at a bail hearing, the United States Attorney told the magistrate that Franco "seems to be the same person" shown in her prior, expired passport. The magistrate said he would grant her bail, but she was returned to the INS facility until October 15, by which time she was to find a "surety" into whose custody she could be released.

h. On October 15, the government moved to dismiss the criminal charges against her, and the magistrate ordered her released.

i. The INS kept Franco in its detention facility from October 15 through October 30, pending a hearing on whether she should be admitted into, or excluded from, the United States.

j. On October 30, the INS permitted Franco to be "paroled" into the United States, *i.e.*, released from the detention facility, because of her bad health, *see* 8 U.S.C. § 1182(d)(5)(A).

k. Subsequently, Franco gave up her effort to enter the United States and returned to the Dominican Republic.

Franco claims that Burgos violated the Constitution when (1) he had her held overnight on October 1, (2) he had criminal charges brought against her, (3) he failed adequately to investigate the basis for those charges, (4) he had her held incommunicado from October 2 to October 15, and (5) he had her held after the charges against her were dropped, from October 15 to October 30.

Burgos moved for summary judgment, *see* Fed.R.Civ.P. 56, arguing basically that the law entitled him to take the actions described above. He said he reasonably believed Franco was using an altered passport, whether or not the passport actually belonged to her. Franco opposed the motion, asking the court at least to permit her to engage in additional discovery. *See* Fed.R.Civ.P. 56(f). The court granted Burgos' summary judgment motion, primarily on the ground that Burgos was entitled to "qualified immunity." *See Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987).

Burgos now appeals the court's grant of summary judgment. She argues that the district court could not legally base its decision on the defense of qualified immunity, because Burgos (inexplicably) did not assert the defense before the district court. *See Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982) (qualified immunity is "an affirmative defense that must be pleaded by a defendant official"); *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed. 2d 572 (1980) ("this Court has never indicated that qualified immunity is relevant to the existence of the plaintiff's cause of action; instead we have described it as a defense ... the burden of pleading it rests with the defendant"). After examining the record, we conclude that the district court should permit additional discovery in respect to Franco's claim of unlawful confinement between October 2 and October 15; otherwise, we conclude that the court's grant of summary judgment was legally correct, even without reliance on the defense of qualified immunity. We can best explain our reasons by dealing separately with the three time periods at issue, October 1–2, 2–15, and 15–30. Our discussion is perhaps rather lengthy, because we do not base our decision on the defense of qualified immunity.

## A.

### *October 1–2.*

■ On October 1, the INS refused to admit Franco to the United States, in accordance with 8 U.S.C. § 1225(b), which says that any alien "who may not appear to the examining immigration officer ... to be clearly and beyond a doubt entitled to land shall be detained for further inquiry." Since Franco would not, or could not, return immediately to the Dominican Republic, the INS placed her in the airline's custody overnight. 8 C.F.R. § 235.3(d) (aliens subject to detention may be placed in the custody of the airline). As we will explain in detail below, Franco was not "clearly and beyond a doubt" entitled to enter the United States, because her passport appeared to have been altered. *See* 8 C.F.R. § 235.3(b) (the exclusion statute, 8 U.S.C. § 1225(b), applies to any alien "who arrives with documentation which appears on its face to be false, altered, or to relate to another person").

Under these circumstances, Franco's initial detention was lawful. Franco points to no law that her initial detention might violate. The federal Constitution offers her no relevant protection. *Landon v. Plasencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982) ("an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative"); *Kleindienst v. Mandel,* 408 U.S. 753, 769–70, 92 S.Ct. 2576, 2585–86, 33 L.Ed.2d 683 (1972) (Congress has "plenary power" over rules for exclusion of aliens); *Knauff v. Shaughnessy,* 338 U.S. 537, 544, 70 S.Ct. 309, 313, 94 L.Ed. 317 (1950) ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned"); *see also Amanullah v. Nelson,* 811 F.2d 1, 4–5 (1st Cir.1987) (Congress has "delegated its unusually broad dominion in the immigration field to the Attorney General," who has the authority to regulate admission of aliens).

## B.

### *October 2–15.*

■ 1. *The filing of criminal charges.* Franco says that Burgos deprived her of her constitutional right to liberty, by having the United States Attorney file a criminal complaint against her. This action does not violate the Constitution, however, if Burgos had probable cause to believe that Franco had committed a crime. *Carey v. City of Fall River,* 870 F.2d 40 (1st Cir. 1989) (per curiam) (officers can be liable under § 1983 for seeking a criminal complaint only if they lacked probable cause); *Losch v. Borough of Parkesburg, Pa.,* 736 F.2d 903, 907 (3rd Cir.1984) (filing of criminal charges without probable cause is actionable under § 1983). And, the record makes clear that Burgos had such "probable cause." It is a crime to "alter" a passport, or to "use" or furnish "to anoth-

er for use," an altered passport, *see* 18 U.S.C. § 1543, or to alter any "document prescribed by statute ... for entry into ... the United States," or use such an altered document, *see* 18 U.S.C. § 1546. The record contains pictures of the passport itself, statements by all five INS inspectors (including Burgos) who examined the passport, all of whom thought it had been altered, and statements by Burgos and another INS inspector that their laboratory tests of the passport confirmed that it had been altered. The photographs show that the paper around the metal pins ("grommets") holding the passport picture in place bears marks suggesting that these pins were removed and replaced. The picture in the passport, according to the inspectors' statements, is covered with two or three plastic coatings (rather than the normal single coating), also suggesting that someone removed, replaced, and relaminated the picture. And, since Franco presented the passport to the INS and, when questioned by Burgos on October 2, insisted that it was hers but could not explain the evidence of alteration, Burgos had probable cause to believe that Franco was responsible for the alteration.

The only contrary evidence in the record consists of an affidavit from a Dominican Vice–Consul, who says that he examined the passport on October 25 and concluded that it "has not been altered." In light of the pictures, tests and INS officers' statements, however, this single conclusory remark can, at most, cast some doubt on whether the passport had in fact been altered, not whether it *appeared* to have been altered. It is insufficient to raise a "genuine issue for trial," *see* Fed.R.Civ.P. 56(e), as to the existence of *probable cause*, at the time Franco was arrested, to *believe* that it had been altered. In our view, given the record in this case, no reasonable person could find an absence of probable cause to believe that Franco had altered the passport. That being so, no jury could find that Burgos acted unconstitutionally in asking the United States Attorney to file criminal charges against Franco. *See Carey*, 870 F.2d at 40.

■ 2. *Further investigation.* Franco claims that Burgos violated the Constitution in failing adequately to investigate the charges against her, prior to testifying against her before the grand jury on October 10. In particular, she says that Burgos should have used INS computers, which would have revealed that she had previously been allowed to enter the United States; he should have called the Dominican consulate, which would have verified that the passport belonged to her; and he should have submitted the passport for laboratory testing.

We do not see, however, how a jury could find that Burgos violated the Constitution by failing to investigate further. The charges against Franco did not turn on whether she was, or was not, the person pictured in the passport; they turned on whether she had *altered* the passport. A report of the INS inspection written on October 2 states:

> Subject presented a photo-switch passport but insists that it is hers. The passport has three laminations on photo page, it is very probable that she may have lent the passport to someone else for money, and it was later returned and her picture was again affixed in the passport. If she did so, she is still amenable for prosecution under 18 USC 1543, mutilation of the passport. Inspection deferred for possible prosecution.

*See* 18 U.S.C. § 1543 ("Whoever ... alters a passport ... with intent that the same may be used" is subject to fine and imprisonment).

Under these circumstances, we do not see how Franco was harmed by Burgos' failure to verify Franco's identity before testifying against her, since such verification would not have exonerated her. And, Burgos' deposition, corroborated by the statement of another inspector, says that Burgos eventually did perform laboratory tests of the passport. Those tests, according to the depositions, indicated that the passport was altered, so we do not see how Franco can claim that, had Burgos performed the tests earlier, they would have revealed that she was innocent.

Regardless, Franco has cited no authority, and we have found none, suggesting that Burgos had a constitutional duty to investigate further, so as to confirm or disprove his initial finding of probable cause, before testifying against Franco. The case law suggests the contrary. *See Kompare v. Stein*, 801 F.2d 883, 890 (7th Cir.1986) (dismissing § 1983 claim against coroner for failure to discover exculpatory evidence before testifying to grand jury, because "the police ... have no constitutional duty to keep investigating a crime once they have established probable cause"); *see also Simmons v. Wainwright*, 585 F.2d 95, 96 (5th Cir.1978) (per curiam) (habeas petitioner's claim that the prosecutor had failed properly to investigate "is not of constitutional dimension. There is no such due process right."); *Rodriguez v. Ritchey*, 556 F.2d 1185, 1190–92 (5th Cir. 1977) ("just because a person validly arrested is later discovered to be innocent does not make the arrest 'unlawful,'" and does not give rise to a § 1983 claim against the officers for failure to investigate).

■ 3. *The confinement.* Franco has a far stronger claim of unconstitutionality in respect to her confinement from October 2 to October 15. She says in her complaint that "the defendant, as case officer in charge, had [her] ... incarcerated in the Salvation Army, without benefit of telephone or without the right to communicate to anyone, including her family." She attached to her opposition to Burgos' motion for summary judgment a statement from her husband, saying that Franco was held incommunicado. The statement, as translated, adds:

> From the building where she was, however, she managed to throw out a note where she said: "To the person who comes across this note, please call this telephone number 582–5500 Santiago, Dominican Rep. Inform Mr. Enrique Dario Jerez that Lillian is detained at the Puerto Rico Emigration building in Puerta de Tierra.

(We attach the full statement as Appendix A.)

Aliens who are criminal defendants, unlike aliens denied admission to the United States, are not free to return to their own country. The Constitution guarantees such persons the same rights possessed by citizens charged with crimes. *Amanullah*, 811 F.2d at 9 (quoting *Jean v. Nelson*, 472 U.S. 846, 873, 105 S.Ct. 2992, 3006, 86 L.Ed. 2d 664 (1985) (Marshall, J., dissenting)); *Jean v. Nelson*, 727 F.2d 957, 972 (11th Cir.1984) ("Aliens seized by United States officials for suspected involvement in criminal activity are entitled to the same constitutional rights that normally apply in such proceedings"), *aff'd*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664; *Rodriguez–Fernandez v. Wilkinson*, 654 F.2d 1382, 1386 (10th Cir.1981) (an alien accused of a crime "would be entitled to the constitutional protections of the Fifth and Fourteenth Amendments"); *see also Wong Wing v. United States*, 163 U.S. 228, 238, 16 S.Ct. 977, 981, 41 L.Ed. 140 (1896) ("aliens shall not be held to answer for a capital or other infamous crime" except by indictment, "nor be deprived of life, liberty or property without due process of law"). Among those rights is the right to counsel, a right that attaches "at or after the initiation of adversary judicial proceedings." *United States v. Gouveia*, 467 U.S. 180, 187, 104 S.Ct. 2292, 2296, 81 L.Ed.2d 146 (1984); *see Brewer v. Williams*, 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977) (criminal defendants have a "vital need" for counsel at the pretrial stage). Franco's husband's statement, at the least, raises an issue of fact as to whether someone denied Franco the right to counsel. Indeed, counsel or no counsel, the Constitution does not permit the government to hold a criminal defendant incommunicado to the point where she must contact her husband by throwing a rock with a message out the window. *Cf. Walters v. Western State Hospital*, 864 F.2d 695, 699 (10th Cir.1988) (denying qualified immunity to hospital for unlawful detention of mental patient, because "the insight of a constitutional scholar is not necessary to conclude that forcibly detaining a person without his consent and holding him incommunicado for a period of seven to ten days implicates that person's

constitutionally protected privacy and liberty interests").

Franco can hold Burgos liable for this detention, however, only if Burgos is, in some relevant sense, responsible for her injury. *See Bivens*, 403 U.S. at 397, 91 S.Ct. at 2005 (plaintiff may recover damages "if he can demonstrate an injury consequent upon the violation by [defendant officials]" of his constitutional rights). And Burgos, in his deposition, said he was not responsible for the conditions of her detention at the Salvation Army facility. He said that he simply turned Franco over to the United States Marshals, who decided where she would be held. Franco has set forth no "specific facts" indicating the contrary. *See* Fed.R.Civ.P. 56(e).

Nonetheless, Franco's counsel filed an affidavit saying that "most of the information needed to adequately oppose defendant's Motion for Summary Judgment is either in the hands of defendant's counsel, or, is as yet unavailable," and asked the district court for more time for discovery. *See* Rule 56(f). And, Burgos made certain statements in his deposition that show a need for further discovery. He conceded, for example, that the INS supervises the Salvation Army facility; that he had taken prisoners there "many times;" and that he could not say which INS official, if not he himself, *was* responsible for the conditions of Franco's detention. Under these circumstances, the district court should not have granted summary judgment on this issue without permitting the plaintiff to undertake further discovery. *See* Rule 56(f) (if it appears that the party opposing summary judgment cannot yet present "facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance" for further discovery); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (summary judgment is proper against a party who fails to establish an essential element of his case, but only "after adequate time for discovery"); *see also Martin v. Malhoyt*, 830 F.2d 237, 256 (D.C.Cir.1987) (citing cases).

We note that the district court granted summary judgment, not because it found Burgos' conduct consistent with the Constitution, but because it found that Burgos had "qualified immunity, shielding [him] from civil damages liability" because his actions "could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson*, 107 S.Ct. at 3038. We cannot affirm its decision on that basis, however, for two reasons. First, Burgos did not plead qualified immunity as an affirmative defense. *See* p. 1040, *supra.* Second, in respect to the conditions of her detention from October 2 to 15, Franco has raised a genuine and material issue of fact which, if resolved in her favor, might overcome any immunity defense (assuming Burgos seeks to amend his answer and raise this defense), due to the clarity of her right to counsel and the possibly egregious nature of her detention.

### C.

#### *October 15–30.*

■ We can find no legal or factual basis for Franco's claim that her detention (as an excludable alien) after October 15, when the government moved to dismiss the indictment, violated the Constitution. Despite the fact that the government dropped criminal charges against Franco, the INS could still reasonably conclude that Franco had not shown that she was "clearly and beyond a doubt entitled to" admission into the United States. *See* 8 U.S.C. § 1225(b); 8 C.F.R. § 235.1(d)(1). Statutes, regulations, and case law permit the INS to detain an unadmitted alien who is not willing to return home, pending an exclusion hearing. *See Amanullah*, 811 F.2d at 5 (§ 1225(b) has been interpreted to authorize detention "pending the ultimate resolution of debarment proceedings"); *Palma v. Verdeyen*, 676 F.2d 100, 103 (4th Cir.1982) (it is lawful to "detain an alien pending exclusion"); *Rodriguez–Fernandez*, 654 F.2d at 1389 (under 8 U.S.C. § 1225(b), "detention is permissible during proceedings to determine eligibility to enter"). And, the Constitution does not provide an unadmitted alien with rights over and

above those that Congress provides by statute. *See Landon*, 459 U.S. at 32, 103 S.Ct. at 329 (aliens have "no constitutional rights regarding" applications for admission); *Knauff*, 338 U.S. at 544, 70 S.Ct. at 313 ("the procedure authorized by Congress is ... due process").

Franco argues that the statutes authorized Burgos to ask the Attorney General to "parole" her, for "emergent reasons," into the United States pending her exclusion hearing (scheduled for November), *see* 8 U.S.C. § 1182(d)(5), and that special circumstances rendered his refusal to do so unconstitutional. *Cf. Rodriguez–Fernandez*, 654 F.2d at 1387–90 (prolonged detention of an alien may be unconstitutional as "punishment" without due process); Note, The Constitutional Rights of Excluded Aliens: Proposed Limits on the Indefinite Detention of the Cuban Refugees, 70 Geo. L.J. 1303 (1982). The circumstances to which she points consist of an INS memorandum saying that a doctor had found that she suffered from "a bleeding ulcer." That same INS memorandum, however, reveals that the INS released her on her own recognizance on October 30, the very day that the doctor visited Franco and diagnosed her illness. There is no evidence in the record showing that she was seriously ill during her detention before this time. Since Franco obviously would know the facts about her own illness, the district court's refusal to permit further discovery is irrelevant. That is to say, we need not excuse her failure to produce some evidence that she was seriously ill, and that she told the INS about her illness, prior to October 30. Without such evidence, Franco has failed to raise a genuine and material dispute of fact concerning the INS's actions in response to her illness. Thus, we need not reach the legal question as to whether, or when, an alien's serious illness might make her continued detention unlawful.

For these reasons, we conclude that the district court properly granted summary judgment in all respects other than Franco's claim of unlawful detention between October 2 and October 15. As to this latter claim, the court should not have granted summary judgment in Burgos' favor; it should have permitted Franco additional discovery.

*The judgment of the district court is affirmed in part; vacated in part; and the case is remanded for further proceedings consistent with this opinion. Costs to appellant.*

## APPENDIX A

### "TO WHOM IT MAY CONCERN"

I, Enrique Dario Jerez, give you a statement about the trip I made to San Juan, Puerto Rico seeking information about my wife Lillian Josefina del Carmen Franco Anido de Jerez, who left on October 1st, 1985. I did not hear from her until I received a call where I was told that my wife had been detained by emigration. It came as a surprise to me. I asked about the reason. They did not know. I was simply informed that my wife was in a building that emigration has in Puerto de Tierra, which is called Salvation Army. According to the person who called me, my wife was being held incommunicado. From the building where she was, however, she managed to throw out a note where she said: "To the person who comes across this note, please call this telephone number 582–5500 Santiago, Dominican Rep. Inform Mr. Enrique Dario Jerez that Lillian is detained at the Puerto Rico Emigration building in Puerto de Tierra.

I was called and upon learning about this, I immediately left to go there. The moment I arrived there, I began looking for information, which proved very difficult to find because my wife was incommunicado. I went to several places trying to get a permit to see her, which I was not granted.

I had to wait until the day of the hearing to see her from afar, because I was not allowed to talk to her either.

I did not know the reason, because I was not allowed to talk to her. All of this came as a surprise to me because my wife had been traveling for close to ten years and had never had any problems.

(sgd.) Illeg.
ENRIQUE DARIO JEREZ

Certified: That this is a correct translation.

/s/_____
Francisco J. Gutierrez
Certified Court Interpreter
Administrative Office of the
United States Courts

Translation Page 121