146 F.3d 680
 98 Cal. Daily Op. Serv. 4441, 98 Daily Journal
D.A.R. 6126
Donald HALVORSEN, Jr., Plaintiff-Appellant,
v.
Lawrence BAIRD; Jeffrey Kaer; City of Portland; Central
City Concern; Dick Endo; Aaron Beedle; Jeff
Mitchell; Joe Brown, Defendants-Appellees.
Donald HALVORSEN, Jr., Plaintiff-Appellee,
v.
Lawrence BAIRD; Jeffrey Kaer; City of Portland; Aaron
Beedle; Dick Endo, Defendants,
and
Central City Concern; Jeff Mitchell; Joe Brown,
Defendants-appellants.
 Nos. 95-35677, 95-35705.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 5, 1996.
Decided June 11, 1998.
 
 Spencer M. Neal and Paul W. Dudley, Ginsburg, Neal & Lesage, Portland, Oregon, for plaintiff-appellant and cross-appellee Donald Halvorsen, Jr.
 Harry Auerbach, City Attorney's Office, Portland, Oregon, for defendants-appellees Lawrence Baird, Jeffrey Kaer, and City of Portland.
 John R. Osburn, Bullivant, Houser, Bailey, Pendergrass & Hoffman, Portland, Oregon, for defendants-appellees and cross-appellants Central City Concern, Jeff Mitchell, and Joe Brown.
 Appeals from the United States District Court for the District of Oregon; John Jelderks, Magistrate Judge, Presiding. D.C. No. CV-93-01233-JAJ.
 Before: CANBY, RYMER and KLEINFELD, Circuit Judges.
 Opinion by Judge KLEINFELD; Partial Concurrence and Partial Dissent by Judge RYMER.
 KLEINFELD, Circuit Judge.
 
 
 1
 This case involves several issues relating to brief civil confinement of intoxicated persons.
 
 FACTS
 
 2
 An intruder had been in Mr. Halvorsen's neighbor's home, and had fled. The neighbor, Mr. Slack, had called the police. While awaiting their arrival, he and Mr. Halvorsen went outside to look for the intruder. Mr. Slack carried a shotgun in case they encountered him. It was around 11 P.M. on a summer evening.
 
 
 3
 When the first policeman came, he treated Halvorsen and Slack as the suspects, and did not pursue the intruder. He saw the two men, one (Slack) with a shotgun, and ordered them to drop the gun and get on the ground. The police officer probably drew his gun and pointed it. Slack told the police officer that his wife was the person who had called the police, and the intruder was black (Slack and Halvorsen were white). The officer wanted the weapon down before listening to the argument. Slack did not want his shotgun on the ground, so he walked behind some bushes, left the gun on the hood of his truck, and came back.
 
 
 4
 The officer ordered the two of them to the ground and waited for backup. He patted down Halvorsen. When a second officer came as backup, the two officers handcuffed Halvorsen and Slack. A number of people gathered. Halvorsen's wife was yelling that the police had the wrong people, the ones who had called them instead of the intruder. Halvorsen's child was screaming "don't shoot my daddy!" The Halvorsens' dogs were barking. Other people were telling the police they were wrong. The police were yelling themselves to make Halvorsen and Slack get on the ground and to make the spectators go away or be quiet, making it even harder to hear what was being yelled at them.
 
 
 5
 The police officers brought the men to a gas station about three blocks away to decide how to proceed. They did not decide to arrest Halvorsen for anything. But they thought he was drunk, because of his obtuseness in not getting down on the ground when ordered to, and his continuing to call them vulgar names and making vulgar remarks. They decided to drop Halvorsen off at a private detoxification facility. About eighteen minutes elapsed between the beginning of the police encounter with Halvorsen and departure for the facility.
 
 
 6
 The facility was a detoxification center operated by a private nonprofit corporation, under contract with the county. A state statute provides for holding intoxicated individuals at such facilities. The owner and several employees of the facility were named as defendants in this case. The testimony established that the facility made its own admission decisions, and sometimes rejected people the police dropped off, so it was not bound to hold Halvorsen because he had been taken there by the police.
 
 
 7
 Halvorsen insisted that he was sober and requested that he be tested so he could prove it. It was the practice of the facility not to give blood tests or breathalyzer tests to see whether people dropped off were really drunk. The facility also did not give field sobriety tests--walk a straight line, touch your nose with your eyes shut, count backwards from 20, etc.--such as police give to suspected drunk drivers. The facility's witnesses did not remember Halvorsen when they testified, because they processed thousands of admissions. The admissions form classified "behavior" in four categories. The first was mental state: "Alert," "Drowsey" [sic], "Stuperous" [sic], or "Unconcious" [sic]. Halvorsen was graded as alert. The second was speech: clear, slurred or unintelligible. Halvorsen was graded as clear. The third was gait: steady, unsteady, or unable to walk. Halvorsen was graded as unsteady. The fourth was physical: parasites, vomiting, or diarrhea, and nothing was noted for Halvorsen. The comments said that "[client] appears unable to care for self" and "odor etoh [ethyl alcohol] on breath." The facility had a practice of recording all admissions in a book and checking the book when someone was brought in, so since Halvorsen had been there once before, the admitting employees may have checked the book and found his name. Halvorsen was held against his will from about 11:30 p.m. to 5:30 a.m., when he was released with a group of other people held overnight.
 
 
 8
 Mr. Halvorsen asked for permission to call his wife, to tell her where he was, but the facility would not let him call her. Nor would they call her. She called 911 to ask where the police had taken her husband, but was told that 911 only took emergency calls. Then she repeatedly called the police precinct station, and eventually someone told her that her husband had been taken to the detox facility. Then she called the detox facility to ask if her husband was there, but they told her that they would not tell her, because that was confidential. Then she drove over there with clothes for him, because all he had on when he was taken away was a pair of shorts, no shoes or shirt. The facility would not admit that he was there and would not take the clothes in for him, even though she told them (based on what the police officer at the precinct house had told her) that she knew he was there. Her husband spent the night in a stinking drunk tank with urine on the floor and was released in the morning. She spent the night parked nearby waiting for him with his clothes.
 
 
 9
 Mr. Halvorsen sued the police, the municipality, and the owner and several employees of the detox facility under 42 U.S.C. § 1983, for various Constitutional violations. The case went to jury trial, and the jury returned a verdict in favor of all defendants.
 
 ANALYSIS
 
 10
 I. The police.
 
 
 11
 A. The stop.
 
 
 12
 Halvorsen claimed that the police violated his constitutional rights by arresting him without probable cause, and unreasonably searching his person when he was patted down. Both these claims went to the jury, which returned a verdict in favor of the police. Halvorsen claims that he was entitled to judgment as a matter of law.
 
 
 13
 The police characterized their relationship to Halvorsen between first encountering him and dropping him off the detox center as a Terry stop. See Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Halvorsen argues that the detention was so coercive and extended that it was an arrest, and that there was no probable cause for an arrest. Halvorsen said that Officer Kaer pointed a gun at him, and Kaer said he did not recall whether he had or not, but that it would not have been inconsistent with the circumstances for him to have done so. It was undisputed that Halvorsen was required to lie on the ground, was handcuffed, and was taken away, first for three blocks to a gas station, then to the detox center. The trial judge let the question go to the jury, with an instruction Halvorsen does not challenge that told the jury how to distinguish between a stop and an arrest.
 
 
 14
 We held in Allen v. City of Los Angeles, 66 F.3d 1052, 1056 (9th Cir.1995), that pointing a weapon at a suspect, ordering him to lie on the ground, handcuffing him, and placing him in a vehicle for questioning for a brief period "does not automatically convert an investigatory detention into an arrest requiring probable cause." Whether the stop becomes an arrest depends on the circumstances. "Police officers are entitled to employ reasonable methods to protect themselves and others in potentially dangerous situations." Id. at 1056. The forceful 24 minute detention in Allen was, as a matter of law, not an arrest because it was reasonable in the circumstances as a means for the police to determine whether there was a reason to arrest Allen. Likewise, we held in Alexander v. County of Los Angeles, 64 F.3d 1315 (9th Cir.1995), that qualified immunity applied to a stop for 45 minutes to an hour, with the suspects handcuffed and held in a patrol car while awaiting arrival of a robbery victim to identify them.
 
 
 15
 This is not to suggest a rule generally immunizing police for stops of up to an hour, or with handcuffs or weapons. As we noted in Alexander, whether the stop should be deemed an arrest depends on the circumstances, including whether the police "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." United States v. Sharpe, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). In Allen and Alexander, the particular circumstances made it reasonable for the police to proceed as they did to confirm or dissipate their suspicions quickly and safely, but in other circumstances similar police actions would be unreasonable, in the absence of probable cause to arrest.
 
 
 16
 Halvorsen would have us distinguish Allen and Alexander on the ground that in them, the suspect was held at the location where he was caught, but Halvorsen was taken to another location. This distinction does not lead to a different result in the circumstances. The jury could conclude that the noise and hostility from the spouses, child, neighbors and dogs made it hard to talk. More important, Slack had walked away with the shotgun and left it out of sight, instead of putting it down on the ground where the policemen could see it, so the jury could conclude that the officers reasonably moved Halvorsen away from where the gun might be in order to question him safely. They took Halvorsen a short distance, only three blocks, so he could easily have walked home had they let him go, and they questioned him in a public place, the gas station lot.
 
 
 17
 Moving a suspect from one location to another does not automatically turn a detention into an arrest, where reasons of safety and security justify moving the person. Eberle v. City of Anaheim, 901 F.2d 814, 819 (9th Cir.1990); see also Florida v. Royer, 460 U.S. 491, 504-05, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) ("there are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention"). This is not to say that police officers may always handcuff a person, or put him down on the ground, or put him in a patrol car, or drive him a few blocks away, on mere suspicion without probable cause. The rule that there is no bright line rule, that it depends on the circumstances, see Royer, 460 U.S. at 506, 103 S.Ct. 1319, goes both ways. But in the circumstances here, the jury could conclude on the evidence before it that the police acted reasonably to effectuate a safe questioning. We need not resolve the question of qualified immunity, because there was a jury verdict in favor of the police.
 
 
 18
 B. The pat down.
 
 
 19
 Halvorsen argues that the pat down to which he was subjected went beyond the bounds of a reasonable Terry frisk, because no reasonable police officer could have thought he was concealing a weapon. All he was wearing was a pair of white shorts--no shirt, no shoes, no underwear. He testified that the policeman pulled the back of the shorts away from his body when he had him up against the car. The policeman testified that Halvorsen could have had a razor blade, small knife or small handgun under the waistband. Considering this testimony, and the fact that Slack had a shotgun, the jury could certainly conclude that the policeman conducted only a minimal search of outer clothing to discover weapons that might be used to assault him.
 
 
 20
 II. The Detox Center.
 
 
 21
 A. Cross appeal--qualified immunity.
 
 
 22
 The detox center and its employees raised a defense of qualified immunity, which the district court struck. Their contention is that they are being sued for constitutional violations committed under color of law, because they were performing a quasi-governmental function pursuant to Oregon statute. Because the function was quasi-governmental, they argue, they were immune from liability except in the circumstances that police officers' or a public agency's conduct would be subject to liability.
 
 
 23
 The director of the Hooper Center, the detoxification facility owned by Central City Concern, testified that Central City Concern was a nonprofit organization that administered various social programs. Hooper Center operated a voluntary long term detoxification program, and an involuntary emergency dropoff facility for people picked up on the street incapacitated by intoxication. Public funding covered the expense. An Oregon statute provides that a person intoxicated in a public place may be taken by the police to a "treatment facility." Or.Rev.Stat. § 430.399(1). A state agency approves public and private "treatment facilities." Or.Rev.Stat. § 430.306(1).
 
 
 24
 A private firm providing a municipality with involuntary commitment services for inebriates does not enjoy qualified immunity, under Richardson v. McKnight, 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997). See also Wyatt v. Cole, 504 U.S. 158, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992); Conner v. City of Santa Ana, 897 F.2d 1487, 1492 n. 9 (9th Cir.1990); F.E. Trotter, Inc. v. Watkins, 869 F.2d 1312, 1318-19 (9th Cir.1989). Richardson held that a private firm providing prison guard services did not enjoy qualified immunity against § 1983 suits. The Court explained that there is no firmly rooted tradition of immunity for privately employed prison guards, and that the purpose of immunity doctrine would not be served by extending it to them. The Court described the purpose as averting the "concern that threatened liability would, in Judge Hand's words, 'dampen the ardor of all but the most resolute, or the most irresponsible' public officials." Richardson, 521 U.S. at ----, 117 S.Ct. at 2106.
 
 
 25
 The Court reasoned that a private guard firm whose guards showed "the most important special government immunity-producing concern, unwarranted timidity" would "face threats of replacement by other firms with records that demonstrate their ability to do both a safer and a more effective job." Id. Likewise if a detox center does a bad job, more effective competitors can bid on the municipal contracts. The Court contrasted the private prison guard firm with "a private individual briefly associated with a government body, serving as an adjunct to government in an essential governmental activity, or acting under close official supervision":
 
 
 26
 The context [of this case] is one in which a private firm, systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government, undertakes that task for profit and potentially in competition with other firms. The case does not involve a private individual briefly associated with a government body, serving as an adjunct to government in an essential governmental activity, or acting under close official supervision.
 
 
 27
 Id. at 2108. Likewise, Central City Concern is a firm systematically organized to assume a major lengthy administrative task, not a private individual briefly deputized to assist government actors. See Ace Beverage Co. v. Lockheed Information Management Services, 1998 WL 257291 (9th Cir., May 20 1998).
 
 
 28
 The only significant difference between the private prison guard firm in Richardson and the private detoxification facility in the case at bar is that the firm in Richardson was for-profit, the one in the case at bar not-for-profit. That difference is not material, because both profit and nonprofit firms compete for municipal contracts, and both have incentives to display effective performance. That revenues may go to salaries and other activities of the firm, as opposed to dividends, is not likely to dampen the ardor of the nonprofit firm's employees.
 
 
 29
 B. Evidence.
 
 
 30
 Halvorsen argues that claimed errors in admitting evidence require reversal. The judge allowed in evidence, over Halvorsen's objection, that Halvorsen was an alcoholic and had been admitted to the detox facility once about a year before the event at issue, and once about two years after. Halvorsen argues that the risk of unfair prejudice outweighed the probative value, the alcoholism was inadmissible character evidence, and that the subsequent admission was altogether irrelevant.
 
 
 31
 Halvorsen claimed at all times that he was not drunk and was wrongfully detained in the facility. Evidence that would tend to show that he was drunk when the police brought him there was relevant. He argues that alcoholism was a "trait of character" inadmissible under Federal Rule of Evidence 404(a). The judge let expert opinion in that Halvorsen was an alcoholic, and that one typical characteristic of alcoholics is denial that they have been drinking when they plainly have. The judge said that this had a bearing on whether Halvorsen's testimony that he was not drunk could be subjectively truthful, yet false. Alcoholism testimony has sometimes been regarded as inadmissible evidence of character, as Halvorsen argues. See Reyes v. Missouri Pacific Railroad Co., 589 F.2d 791 (5th Cir.1979). But the judge was within his discretion in admitting it in this instance, as evidence of a disease which, if the jury believed the expert testimony, would cause Halvorsen to be mistaken in his claim of sobriety on the night at issue. That some people might draw a negative inference about a litigant's character from otherwise relevant and probative testimony does not make it automatically inadmissible under Rules 403 or 404, though the risk of unfair prejudice must be weighed under Rule 403.
 
 
 32
 The evidence of Halvorsen's prior admission to the detox facility was highly relevant to his damages claim. The jury could reasonably conclude that his mental distress the second time he was so confined would be far less than the first time. The admission subsequent to the one at issue was relevant to show that some of Halvorsen's continuing mental distress might be caused by that subsequent admission. If a person's damages are "I was extremely upset by the event," then evidence of similar events before and after the one at issue may support an inference that part or all the distress was attributable to the other events. This is analogous to a personal injury case, in which evidence that pain and suffering was entirely attributable to one injury may be challenged by evidence that the plaintiff suffered injuries to the same part of the body both before and after the one at issue, to which part or all the pain and suffering could be attributed. The subsequent admission, at which Halvorsen was plainly very drunk yet denied drinking, also corroborated the experts' testimony, that his alcoholism caused him to deny drinking when he was drinking.
 
 
 33
 Halvorsen was not permitted to call six witnesses who would have testified that they had been confined at the facility even though they had not been drinking. The judge reasonably exercised his discretion under Federal Rules of Evidence 611(a) and 403, to keep the evidence out because of the risk of confusion and undue consumption of time. The judge was concerned that Halvorsen and the detox center would have to battle out whether each of these individuals was drunk or not. Halvorsen was permitted to put the issue fairly before the jury, by calling a former employee who testified that sometimes the facility held people who were not especially drunk.
 
 
 34
 We review all these evidence decisions by the trial judge only for abuse of discretion. None fell outside that standard.
 
 
 35
 C. Due process.
 
 
 36
 Halvorsen claims that he was unconstitutionally deprived of due process of law by his incommunicado confinement for a status offense, and that he was deprived of a fair opportunity to prove that he was not intoxicated. Halvorsen's claim that he was improperly confined because of his status and not his conduct was denied as a matter of law. The court instructed the jury that "The United States Constitution does not prohibit the detention of a person who is found intoxicated in a public place in a detoxification center until he is no longer intoxicated." His claim that being held incommunicado violated the Constitution was also resolved as a matter of law. In the pretrial conference, the magistrate judge ruled "as a matter of law that the constitution under these facts does--did not require the detox center to allow Mr. Halvorsen a telephone call." Thus the jury was not instructed that it could award damages for deprivation of a phone call. The jury was given the question whether the detox center fairly decided whether Halvorsen was intoxicated, and implicitly found that it did.
 
 
 37
 1. Status offense.
 
 
 38
 Halvorsen argues that he was confined for being intoxicated and nothing more, which violated his right to substantive due process under O'Connor v. Donaldson, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). O'Connor has little bearing, because the jury there found that the person was not dangerous to himself or others, and because the Court expressly noted that it involved "no challenge to the initial commitment, but is focused, instead, upon the nearly 15 years of confinement that followed." Halvorsen was confined for a short time, and his challenge is to the initial commitment.
 
 
 39
 Halvorsen was confined, not for being drunk, but for being "in a public place" while drunk, Or.Rev.Stat. § 430.399(1). His conduct rather than his status as an alcoholic led to his confinement. See Powell v. Texas, 392 U.S. 514, 532, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968). Had he merely been an alcoholic, or had he remained in his home while intoxicated, he would not have been subject to the statute. The incident that led to his confinement, standing in the street with an armed man and defying the orders of a policeman pointing a gun at him, supported a conclusion that he posed a risk to his own and others' safety. Detaining a person intoxicated in a public place and confining him overnight until sober enough to be safe does not deprive the person of a constitutional right. Id.; see also Church v. City of Huntsville, 30 F.3d 1332, 1346 (11th Cir.1994).
 
 
 40
 2. Notice.
 
 
 41
 Halvorsen argues that he was entitled to notice of why he was being confined, and an opportunity to be heard on whether the confinement was justified. He cites no case showing that, in the circumstances, his overnight confinement would require any more notice and opportunity to demonstrate his sobriety than he was given. The testimony was that he was told why he was there, that he was observed for indications of drunkenness or sobriety, and that it was the practice of admitting employees to check a book for prior admissions, which would have shown that Halvorsen had been there before.
 
 
 42
 The jury instructions required the jury to have found that "the admission decision was based upon a good faith finding by the evaluator that there is probable cause to believe the person is intoxicated." Halvorsen argues that some sort of hearing would have enabled him to prove that he was not drunk, and that the facility did not give him a breathalyzer or field sobriety test. He does not argue that he has an independent right to a particular test, such as a breathalyzer or blood test, to determine his alcohol level, so we do not intimate an opinion on that question. He did put evidence before the jury that the detox center did not perform these tests, and the jury nevertheless found that the facility personnel reasonably concluded that he was drunk. There was evidence from which a reasonable jury could come to that conclusion, even though it was subject to attack because of the failure of the detox center to administer any of the ordinary tests police use to detect drunk drivers.
 
 
 43
 3. Communication.
 
 
 44
 Halvorsen argues that he was deprived of due process by being held incommunicado. As we explain above, the jury was not given this question. The magistrate judge resolved it against Halvorsen as a matter of law. Halvorsen argues that a person "may not be held incommunicado by the state," citing Strandberg v. City of Helena, 791 F.2d 744 (9th Cir.1986), Franco-de Jerez v. Burgos, 876 F.2d 1038 (1st Cir.1989), Walters v. Western State Hospital, 864 F.2d 695 (10th Cir.1988), and Bossingham v. Klamath County, 81 Or.App. 399, 725 P.2d 931 (1986).
 
 
 45
 Halvorsen testified that he asked to make a phone call, and was not allowed to do so. His wife testified that when she called and later visited to drop clothes off for him, the facility would not tell her whether he was there and would not take the clothes for him. The facility's witnesses testified that, although they did not recollect Halvorsen's admission, their practice was to allow the inmate to call if it appeared safe in the circumstances, but not to tell others that he was there because of "confidentiality laws." Facility policy left phone calls to staff discretion. The basic requirements for a phone call were that the person not be demonstrating violent or combative behavior and appear to have some sort of strong affiliation to the person being called. Staff did not want violently drunk people out in the hallway where they might be dangerous and hard to control, and did not want them waking strangers up late at night with drunken phone calls.
 
 
 46
 The Magistrate Judge characterized Halvorsen's claim to a right to a phone call as moot, because his wife knew where he was, and he could not get out until morning regardless of whether he made a phone call. We cannot agree. Though Halvorsen's wife had been told that he had been taken to the detox center, she could not obtain confirmation. Halvorsen could not talk to her, and he could not confirm that she knew where he was. Also, where the evidence of intoxication is as thin as it was for Halvorsen, one cannot rule out the possibility that an attorney or other powerful outsider might have effected Halvorsen's release by inducing detox center personnel to perform a field sobriety test.
 
 
 47
 Communication has value even if it would not get a person released. A phone call could reduce the mental distress to the person confined. It could also reduce the anxiety of those who might wonder where he was, such as a spouse, parent, or unsupervised child. If the person confined had a medical condition requiring continual monitoring and treatment, such as diabetes, communication would enable the person called to communicate the need for treatment and drop off appropriate medicines. Also, the person called could be there to pick the person up the next morning and provide proper clothing if necessary (as it was in this case).
 
 
 48
 There is a well established tradition against holding prisoners incommunicado in the United States. It would be hard to find an American who thought people could be picked up by a policeman and held incommunicado, without the opportunity to let anyone know where they were, and without the opportunity for anyone on the outside looking for them to confirm where they were. Federal case authority is surprisingly scanty, perhaps because our tradition is so strong, or perhaps because statutes protect the right to communicate after arrest in the more common circumstances. See, e.g., Alaska Stat. § 12.25.150(b); Cal.Penal Code § 851.5; Haw.Rev.Stat. § 803-9(2); Nev.Rev.Stat. § 171.153; 8 Guam Code Ann. § 20.65(b). We have not found an Oregon statute on point, but the Oregon Supreme Court has established that "an arrested person is entitled to communicate with counsel or others and ... the police must reasonably accommodate a request to do so unless it would interfere with their duties." Moore v. State, 293 Or. 715, 652 P.2d 794, 797 (1982); see also State v. Newton, 291 Or. 788, 636 P.2d 393, 406 (1981) (plurality opinion) ("allowance of a telephone call following arrest has become traditional and incommunicado incarceration is regarded as inconsistent with American notions of ordered liberty").
 
 
 49
 We have recently said in dicta that holding a prisoner incommunicado in violation of state law violates his Fifth Amendment due process rights. Henry v. County of Shasta, 132 F.3d 512, 519 (9th Cir.1997). We have also stated in dicta that prisoners "have a First Amendment right to telephone access, subject to reasonable security limitations." Keenan v. Hall, 83 F.3d 1083, 1092 (9th Cir.1996); Strandberg v. City of Helena, 791 F.2d 744, 747 (9th Cir.1986). Then-Judge Breyer wrote for the First Circuit, in a case where a woman was held incommunicado in a Salvation Army facility for thirteen days, that "the Constitution does not permit the government to hold a criminal defendant incommunicado to the point where she must contact her husband by throwing a rock with a message out the window." Franco-de Jerez v. Burgos, 876 F.2d 1038, 1042 (1st Cir.1989). With respect to incommunicado confinement of a mentally ill person, the Tenth Circuit said "the insight of a constitutional scholar is not necessary to conclude that forcibly detaining a person without his consent and holding him incommunicado for a period of seven to ten days" implicates a "clearly established" "constitutional right to communicate with persons outside the institution." Walters v. Western State Hospital, 864 F.2d 695, 699 (10th Cir.1988).
 
 
 50
 Oddly, the cases do not clearly explain where the right not to be held incommunicado comes from. They say that the right is obvious. Ancient principles limit conditions of detention without conviction of a crime. Blackstone explained that detention prior to conviction "is only for safe custody, and not for punishment: therefore, in this dubious interval between the commitment and trial, a prisoner ought to be used with the utmost humanity; and neither be loaded with needless fetters, or subjected to other hardships than such as are absolutely requisite for the purpose of confinement only: though what are so requisite, must too often be left to the discretion of the gaolers; who are frequently a merciless race of men, and, by being conversant in scenes of misery, steeled against any tender sensation." IV William Blackstone, Commentaries on the Laws of England 297 (1769). Bell v. Wolfish, 441 U.S. 520, 540, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), holds that the Due Process Clause requires conditions of pretrial confinement to be analyzed according to whether they are appropriate to assure the detainees' presence at trial and to maintain the security and order of the detention facility and otherwise manage the detention facility. We conclude that part of the process due to a person if his liberty is taken is the opportunity to communicate with someone outside the institution where he is held, at a time and in a manner consistent with practical management of booking and confinement procedures and institutional security and order.
 
 
 51
 That a person is committed civilly, for his own and others' protection, rather than criminally, to hold him until a decision can be made whether to punish him, cannot diminish his right not to be held incommunicado. Cf. Youngberg v. Romeo, 457 U.S. 307, 321-22, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); Walters v. Western State Hospital, 864 F.2d 695, 699 (10th Cir.1988). Either way, the government deprives him of his liberty, so owes him the process due for depriving someone of his liberty.
 
 
 52
 Of course the facility can control the manner and timing of the call so that it comports with reasonable institutional requirements. In Strandberg v. City of Helena, 791 F.2d 744 (9th Cir.1986), we held that the young man jailed for reckless driving, who hung himself within a half hour of incarceration, had not been entitled to call his parents during booking. We said his right to communicate was "subject to rational limitations in the face of legitimate security interests of the penal institution." Id. at 747.
 
 
 53
 Judge Rymer is troubled by two points, that none of the cases in point have related to detox center confinement as opposed to criminal or mental commitment, or have rejected incommunicado confinement as short as six hours. We acknowledge that she is right about the cases. But we see no reason to distinguish this case because the commitment was for being drunk in public rather than on a criminal charge or for being insane. The reason why the individual is entitled to communication is that the government is confining him physically, and that reason applies to all these kinds of confinement.
 
 
 54
 Halvorsen's six hour confinement cannot be held too short, as a matter of law, to entitle him to communicate. The duration of incommunicado confinement has to be considered against the reasons why communication might be necessary, and why it might be impractical. A six hour disappearance during the night is long enough to raise significant concerns in any spouse or parent about where the disappeared person is. It is long enough for some chronically ill individuals to need medication. And it is long enough to provide a safe means of communication "subject to rational limitations in the face of legitimate security interests of the penal institution." Strandberg, 791 F.2d at 747. If the intoxicated person is too violent to release safely from his cell, or hand a phone to, a speaker phone outside the cell could easily be used, or a person in the facility could make the call for him. That the call need not be allowed immediately upon entry into the facility does not absolve the facility of the obligation to allow a call by a reasonable means and within a reasonable time.
 
 
 55
 The detox facility argues that federal confidentiality laws prevented them from allowing any communication. The federal statute referred to says that "records" of the identity or treatment of any patient in connection with any program relating to substance abuse that is directly or indirectly assisted by the federal government are "confidential." 42 U.S.C. § 290dd-2(a). But they can be disclosed "with the prior written consent of the patient." 42 U.S.C. § 290dd-2(b)(1). We need not decide whether disclosing the physical presence of an individual in an institution amounts to disclosure of "records." The briefs do not address the regulations promulgated pursuant to § 290dd-2, so we do not consider them. Because of the patient consent provision, the statute did not bar disclosure. Halvorsen could have signed a consent form as a condition of communicating with his wife, had it been offered. The facility argues that intoxication would have prevented him from giving valid consent to waive his own confidentiality right, but cites no case for the point, and we do not see why it would, any more than intoxication prevents a drunk driver from waiving his right to remain silent and confessing to how many drinks he had. Because it is subject to a construction that does not require holding people incommunicado, we need not rule on whether a contrary construction of the statute would be unconstitutional.
 
 CONCLUSION
 
 56
 We affirm the judgment in favor of Lawrence Baird, Jeffrey Kaer, and the City of Portland. We reverse the judgment in favor of Central City Concern, Dick Endo, Aaron Beedle, Jeff Mitchell and Joe Brown, and remand for a new trial or other proceedings to determine whether they or any of them deprived Halvorsen of his right not to be held incommunicado beyond what was reasonable and such damages as may relate to that deprivation.
 
 
 57
 RYMER, Circuit Judge, concurring in part and dissenting in part:
 
 
 58
 I, too, do not like the idea of a person being held without a telephone call, and there are many reasons (as the majority suggests) why it's a good idea to allow prompt communication. But I do not believe Halvorsen was denied due process just because he couldn't call his wife for six hours, at least not under the circumstances of this case.
 
 
 59
 Halvorsen's wife knew where he was, but Halvorsen wanted to call her so that she could testify that he had not been drinking that evening.[1] However, involuntary civil confinement does not require an adversarial, pre-deprivation hearing, Doe v. Gallinot, 657 F.2d 1017, 1024 (9th Cir.1981), so Halvorsen could not have suffered injury of constitutional dimension on this account. Nor did he have a Sixth Amendment right to counsel to protect by a phone call. And he did not at trial (and does not on appeal) assert a First Amendment violation.
 
 
 60
 Nevertheless the majority locates a right to telephone access in the due process clause based on cases that have found it unconstitutional to hold incommunicado a criminal defendant--which Halvorsen wasn't--or an involuntarily committed mental patient--which he also wasn't--for significantly longer periods of time than he was. Franco-de Jerez v. Burgos, 876 F.2d 1038 (1st Cir.1989) (thirteen day incarceration without call); Walters v. Western State Hosp., 864 F.2d 695 (10th Cir.1988) (mental patient unlawfully detained and held incommunicado for 7-10 days). See also Strandberg v. City of Helena, 791 F.2d 744 (9th Cir.1986) (noting that courts have recognized detainees' and prisoners' First Amendment right to telephone access subject to reasonable limitations, and finding nothing unreasonable about declining to allow telephone call in the first thirty minutes of detention); Rodgers v. Lincoln Towing Service, Inc., 771 F.2d 194 (7th Cir.1985) (no constitutional violation from denial of call to counsel for ten and one-half hours). Whether or not a detox detainee has a right to call outside at some point, I see no basis in these authorities, or in the record of this case, for concluding that CCC acted so unreasonably that it could have denied Halvorsen (who was intoxicated) due process by holding him for the six hours he was at the detox facility without a call to his wife (who knew where he was).
 
 
 61
 As there was no reversible error in my judgment, I dissent from Part II C 3 of the opinion.[2]
 
 
 
 [1]
 He requested a jury instruction to this effect
 
 
 [2]
 There is no reason for me to reach the issue of qualified immunity