BERZON, Circuit Judge,
dissenting:
Viewed realistically, what the majority holds is that the district court correctly abdicated to Loughner’s prison physicians the responsibility to determine whether he is to be restored to trial competency through involuntary medication. The form of the majority opinion obscures that holding, as it addresses first the quite separate question of the standards and procedures applicable to the mid-commitment decision to medicate a pretrial detainee for reasons of dangerousness. But that is not where we are now in this case. Instead, we are, principally, reviewing the district court’s decision as to whether Loughner is to be committed to a federal medical facility for purposes of restoration of competency to stand trial, a goal that, all agree, could be accomplished only through psychotropic medication, which Loughner refuses to take voluntarily. As I cannot agree that Loughner may be so committed without a judicial determination as to the propriety of involuntary medication and because, even on the majority’s approach, I see several deficiencies in the administrative proceedings conducted by the medical center’s physicians — I respectfully dissent.
I. Background
I begin by highlighting certain aspects of the relevant proceedings crucial to the resolution of this case.

A. The first Harper proceeding

As the nation is well aware, Jared Loughner, a seriously disturbed young man, shot at Congresswoman Gabrielle Giffords and her entourage outside a Tucson supermarket on January 8, 2011, profoundly injuring her and killing Federal District Judge John Roll and five others. He was indicted for numerous criminal offenses relating to the shooting. Finding that Loughner presented a danger to the community, the district court ordered him committed to the federal government’s custody for confinement at a corrections facility pending trial. Two months later, the district court granted the government’s motion for a competency examination and, pursuant to 18 U.S.C. § 4247, committed Loughner to the United States Medical Center for Federal Prisoners in Springfield, Missouri (FMC-Springfield) for evaluation. There, a Bureau of Prisons staff psychologist, Dr. Christina Pietz, and an independent psychiatrist, Dr. Matthew Carroll, examined Loughner and issued forensic reports to the district court. Doctor Pietz observed in her report that Loughner “was polite, cooperative, and forthcoming” during their initial interview and that he was, “[f]or the most part ... cooperative with correctional staff’ during the examination period. Both Dr. Pietz and Dr. Carroll diagnosed Loughner with schizophrenia and concluded that he was, *776 at that time, incompetent to stand trial.[1] The district court agreed and ordered Loughner committed to the Attorney General’s custody for a four-month period of hospitalization at FMC-Springfield, to “determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward.” 18 U.S.C. § 4241(d)(1).
At FMC-Springfield, Loughner’s physicians prescribed psychotropic medication, but Loughner refused to take it. The facility therefore decided to conduct an administrative proceeding to determine whether Loughner should be involuntarily medicated. On June 2, Dr. Pietz, now Loughner’s treating psychologist, provided Loughner a Notice of Medication Hearing and Advisement of Rights form. The form explained that Loughner was diagnosed with “undifferentiated schizophrenia” and that the proposed treatment was “anti-psychotic medication.” Under the heading “Reason for Treatment,” the form stated: “Mr. Loughner suffers from a mental illness and refused to take the medication prescribed to him. He was referred to this facility to restore competency.”
On June 14, the prison conducted an administrative involuntary medication hearing (“Harper I ”), pursuant to the procedures outlined in the then-current federal regulation, 28 C.F.R. § 549.43, and Washington v. Harper, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990). Doctor Carlos Tomelleri, a prison psychiatrist not involved in Loughner’s diagnosis and treatment, presided over the proceedings. The hearing’s other participants included Loughner, his staff representative John Getchell (a prison employee who is a licensed social worker), Dr. Robert Sarrazin (chief of psychiatry at FMC-Springfield and Loughner’s treating psychiatrist), and Dr. Pietz.[2]
The hearing did not go well. Loughner barricaded himself behind his bed and refused to participate in the proceeding. There is no evidence in the record to suggest that Getchell made any statements or inquiries on Loughner’s behalf at the hearing.
In his post-hearing involuntary medication report, Dr. Tomelleri concluded that the involuntary administration of psychotropic medication was justified on the ground that Loughner was dangerous to others. Doctor Tomelleri noted that Loughner had several times thrown plastic chairs against a metal grill, behind which was Dr. Pietz, and at a wall; had tried to throw toilet paper at a camera; had spat and “lunged” at one of his attorneys (a characterization the defense disputes); continued to suffer from auditory hallucinations; laughed inappropriately; made poor eye contact; and repeatedly yelled the word “No!” Comparing the relative merits of psychotropic medication and other, less intrusive treatment options, Dr. Tomelleri wrote:
Treatment with psychotropic medication is universally accepted as the choice for conditions such as Mr. Loughner’s. Other measures, such as psychotherapy, are not practicable and do not address *777 the fundamental problem. Minor tranquilizers (benzodiazepines) are useful in reducing agitation, but have no direct effect on the core manifestations of the mental disease. Seclusion and restraints are merely temporary protective measures with no direct effect on mental disease.
Dr. Tomelleri concluded that involuntary medication was justified but neither identified the proposed medication regimen nor established any limits on what medication might be administered.
Loughner appealed the authorization of involuntary medication. On the appeal form, he wrote: “You can’t make me take any drug! I know it’s cruel punishment,” and added profane comments. Getchell confirmed that Loughner wished to appeal the decision of the hearing psychiatrist and that he desired to submit the incoherent, profanity-laced statement; Getchell made no effort to develop actual arguments in support of the appeal.
The prison’s Associate Warden for Health Services (“the warden”) upheld Dr. Tomelleri’s authorization of involuntary medication. The warden concluded that Loughner was dangerous to others because he “engagfed] in conduct, like throwing chairs, that is either intended or reasonably likely to cause physical harm to another or cause significant property damage.” He further informed Loughner that “medication is the best treatment for your symptoms,” and that “[mjinor tranquilizers, seclusion or restraints are only temporary in nature and have no direct effect on your symptoms or illness.”
On June 21, Dr. Sarrazin filled out an administrative note indicating that Loughner was to be treated twice daily, for 30 days, with 0.5 mg oral solutions of Risperidone.[3] That same day, defense counsel first became aware of the involuntary medication decision. Soon thereafter, defense counsel filed a motion in the district court seeking to enjoin Loughner’s involuntary medication. Proffering testimony from a former Bureau Of Prisons official and a forensic psychiatrist with a background in prison administration and involuntary medication decisions, defense counsel argued that Loughner’s status as a pretrial detainee entitled him to an evidentiary hearing before the court as a prerequisite to involuntary medication, and that the prison had not sufficiently justified the need for psychotropic drugs over less-intrusive alternatives.
The district court held that Loughner was entitled neither to a judicial evidentiary hearing on the involuntary medication issue nor to the heightened substantive standards advocated by the defense. Instead, the court adopted the approach of United States v. Morgan, 193 F.3d 252, 262-63 (4th Cir.1999), and reviewed the prison’s Harper I determination for arbitrariness. Finding “no evidence that the FMC staff is in any way an ally of the Government prosecution team,” and pointedly noting that 18 U.S.C. § 4241(d) did not charge FMC-Springfield’s staff “with the obligation to restore [Loughner] to competency,” the court concluded that “the procedures followed by the FMC staff at the § 549.43 hearing, and the finding of the presiding independent psychiatrist, were not arbitrary.” The court further concluded that the procedural protections afforded Loughner satisfied Harper’s due process requirements.

*778
B. The Emergency Medication Proceeding

On July 1, a motions panel of this Court granted Loughner’s motion for a temporary stay of involuntary medication pending appeal. On July 12, the panel continued the stay, with the clarification that it applied specifically to psychotropic medication and that other measures (such as involuntarily administered tranquilizers) remained available. In response to this Court’s stay orders, FMC-Springfield immediately stopped administering Loughner’s psychotropic medication.
Loughner’s condition deteriorated significantly after the sudden withdrawal of medication. On July 8, FMC-Springfield placed him on suicide watch. Ten days later, FMC-Springfield doctors determined that he was a severe danger to himself and authorized psychotropic medication on an emergency basis, a decision this Court was also asked to stay but did not. On August 11, the defense filed a motion seeking to enjoin the emergency administration of psychotropic medication, which the district court denied.

C. The Second Harper Proceeding

On August 25, FMC-Springfield conducted a second Harper hearing (“Harper II”), pursuant to 28 C.F.R. § 549.46, the newly promulgated replacement for 28 C.F.R. § 549.43. See 76 Fed.Reg. 40229-02, 2011 WL 2648228 (Aug. 12, 2011). Doctor Tomelleri again concluded that involuntary psychotropic medication was justified, this time based on the threat Loughner’s behavior posed to his own safety. On administrative appeal from the Harper II involuntary medication order, the warden determined that the Harper II proceeding was invalid because the administrative hearing officer had failed to obtain a pre-hearing witness statement from Loughner’s requested witness (defense counsel Anne Chapman).[4]

D. The Third Harper Proceeding

On September 15, 2011, FMC-Springfield conducted its third Harper hearing (“Harper III”). Doctor Tomelleri, again presiding, concluded that involuntary psychotropic medication was justified on the basis of the danger Loughner posed to himself. In reaching this result, Dr. Tomelleri noted that Loughner’s condition deteriorated significantly after involuntary medication was discontinued in July, and observed that, although many of Loughner’s psychotic symptoms had abated after medication resumed, he continued to exhibit signs of restlessness, guilt, and suicidal ideation.
Doctor Tomelleri determined that psychotropic medication was justified because “[discontinuation ... is virtually certain to result in an exacerbation of Mr. Loughner’s illness as it did when medication was discontinued in July.” Echoing, nearly verbatim, the justification asserted in the Harper I and Harper II proceedings, he added that “[pjsychotropic medication is the treatment of choice for conditions such as Mr. Loughner is experiencing,” and rejected “[o]ther measures, such as psychotherapy, [because they] do not address the fundamental problem.” He further noted that “[s]eclusion and restraints are merely protective temporary measures with no direct effect on the core manifestations of the mental illness.” As in the Harper I proceeding, Dr. Tomelleri did not specify any limits on the types or dosages medications that might be involuntarily admin *779 istered or describe the proposed future treatment plan. He did, however, list Loughner’s current medication regimen, and indicated that a treatment plan could be found on Loughner’s chart. On appeal, the warden determined that Loughner had been afforded his due process rights and, rejecting alternatives because they would “not impact the underlying cause or relieve the symptoms of [Loughner’s] mental illness,” upheld Dr. Tomelleri’s involuntary medication order.
After his administrative appeal was denied, Loughner filed an emergency motion in the district court to enjoin his involuntary medication under the Harper III order. In addition to reiterating his previous arguments, Loughner argued that his staff representative had provided inadequate representation and that the Bureau of Prisons had not established that anti-psychotic medication was needed to treat his dangerousness to self. The district court briefly addressed Loughner’s motion at the § 4241(d)(2)(A) commitment hearing conducted on September 28, 2011, and in the ensuing written opinion.

E. Request for Commitment Pursuant to 18 U.S.C. § mi(d)(2)(A)

In her August 22 and September 7 progress reports to the district court, Dr. Pietz summarized Loughner’s hospital course, described his current mental status and psychiatric treatment, and provided her opinions as to the probability that he could be restored to competency for trial and as to the likely length of treatment toward that end. Doctor Pietz concluded that Loughner would likely be restored to competency “in the near future.” The government accordingly asked the district court to commit Loughner for the purpose of restoring his trial competency, pursuant to 18 U.S.C. § 4241(d)(2)(A). Loughner filed a motion objecting to commitment under § 4241(d)(2) and asking the court to “engage in a predictive analysis not unlike that developed in Sell [v. United States, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003) ] and its progeny, in which the court must not only assess the substantial likelihood of competency restoration but also consider the potential side effects caused by the drugs used to restore competency.”

F. The September 28 Hearing

On September 1, the district court issued an order scheduling Loughner’s § 4241(d)(2)(A) commitment hearing. The order stated that “the scope of the hearing will be limited to the question of whether an additional period of time should be granted to actually restore the defendant to competency.” The court also conducted a telephonic status conference in advance of the commitment hearing. During the telephonic conference, Dr. Pietz informed the court that Loughner wished to attend the commitment hearing. The court concluded that Loughner had a right to attend the hearing, pursuant to 18 U.S.C. § 4247(d), and accordingly “require[d] that [Loughner] be present for the extension hearing.”
On September 28, the district court conducted the § 4241(d)(2)(A) commitment hearing. In addition to the district judge and counsel for both parties, Loughner, Dr. Pietz, and Dr. Ballenger (a clinical psychiatrist and expert witness for the government) convened at the Tucson courthouse for the proceedings. At the outset, the court reiterated its intention to restrict the evidentiary aspect of the hearing to the commitment issue, even though other matters — specifically, the defense’s recently submitted motion to stay Loughner’s involuntary medication under the Harper III order — were pending.
*780 As the majority describes in fuller detail, Dr. Pietz and Dr. Ballenger testified at length about Loughner’s progress and his prospects for restoration through involuntary medication. During the hearing, the court persistently emphasized that “[t]he limited focus here is whether an extension is likely — substantially probable to restore him.” So stating, the court repeatedly prevented defense counsel from cross-examining Doctors Pietz and Ballenger regarding Loughner’s diagnosis and the propriety of the drugs prescribed for treating his dangerousness. Although defense counsel argued that “[t]he restoration depends upon the treatment that’s going to be given,” the court reiterated that “[t]he question here is whether he’s likely to be restored with an extended commitment to Springfield.”
At the conclusion of the hearing, the district court determined that Loughner was likely to be restored to competency within a reasonable period of time, assuming he continued to receive involuntary medication. It accordingly held that Loughner’s commitment should be extended by four months, pursuant to 18 U.S.C. § 4241(d)(2). The court emphasized that it was recommitting Loughner for the express purpose of restoration: “I’m now committing him for the purpose of restoration. No more evaluation. It changes today with this ruling. He’s being committed for another four months for the purpose of restoration.” It also expressed a concern that the procedural and substantive standards applicable under Sell when the government seeks to medicate involuntarily a pretrial detainee for purposes of restoration to competency were implicated by the court’s decision to extend Loughner’s commitment for the express purpose of restoration. “I’m committing him at a time that I know that they’re continuing to treat him with medication that he declines to take,” the court stated, “I think this is a very different situation from what has existed to this point. I’m now telling them to continue to restore him. I think we’re right up against Sell.” The court concluded that a Sell judicial hearing, or at least some acknowledgment of the Sell issue, needed to take place, but stated that it was postponing the matter to a later date.
Before the hearing adjourned, defense counsel reminded the court of its pending motion to stay Loughner’s involuntary medication. The court emphasized that it was “not being stubborn,” but stated that it continued to believe that the Bureau of Prisons should determine the propriety of Loughner’s involuntary medication so long as the purpose of medication related to his dangerousness, even if it was an essential predicate for the court’s commitment decision. Reaffirming its reliance on Morgan, the court stated it would review the prison’s Harper III determination only for arbitrariness and for compliance with 28 C.F.R. § 549.46 and Harper. The court concluded that there was “no arbitrariness in the third Harper hearing and that the medication going forward, at least of today, is authorized pursuant to the Harper case.” Loughner appealed.
While Loughner’s appeal was pending, the district court issued an order holding that Loughner is not entitled to a judicial Sell hearing regarding the propriety of pretrial involuntary medication where the ultimate goal is restoration of competency. The court acknowledged that it was “shifting the aim of [Loughner’s] commitment from evaluation to restoration,” but reasoned that “the Supreme Court, in Sell, contemplated that a pretrial detainee could be incidentally restored to trial competency by being medicated on dangerousness grounds under Harper.” The court accordingly concluded that Loughner was not entitled to further procedural protections, because the prison “doctors have *781 made a medical determination in this case justifying the need for medicating Mr. Loughner under Harper, which the Court has reviewed and has concluded was not arbitrary.”
II. The Commitment Decision
The majority first labors to determine whether this case is governed by Harper or by Sell, and settles on the former with regard to the pretrial-medication-for-dangerousness question. The majority then proceeds to treat that prior medication decision as a background event that the district court did not need to revisit itself when deciding whether to commit Loughner to FMC-Springfield for restoration of competency. But the majority’s analysis goes off course proceeding in this fashion, in two ways: The majority addresses the questions before us in the wrong order, as the commitment decision is the currently operative one. And it seeks to sort the issues we face into a preexisting “box”— that is, either Harper or Sell — when, in fact, this case presents us with somewhat novel questions.
Specifically, we must decide whether a district court may rely on a prior administrative authorization to medicate involuntarily a pretrial detainee based on dangerousness to self, issued while the detainee was under an earlier commitment order, to justify a new commitment for the express purpose of restoration of competency pursuant to 18 U.S.C. § 4241(d)(2)(A). The question is a difficult one, for it requires us to weigh the interests and values at stake in two separate, but related, proceedings, conducted for different reasons. Reviewing those interests, together with the principles gleaned from Sell and our post-Sell cases, I conclude that a court may not commit a pretrial detainee for the purpose of restoring his trial competency through involuntary medication without itself deciding that involuntary medication is both justified on some properly applicable ground and unlikely to infringe the detainee’s fair trial rights.
Because of the way it structures its opinion, however, the majority does not squarely confront the now-dispositive question. Instead, the majority cleaves the issue of Loughner’s involuntary medication from the question of his commitment for restoration, even though the commitment decision was entirely dependent on continuing the involuntary medication during the entirety of Loughner’s treatment for restoration of competency at FMC-Springfield. In other words, the majority holds that it was proper to commit Loughner to FMC-Springfield for restoration of competency because, if so committed, the earlier administrative decision to medicate him for dangerousness to himself could be relied upon, and if thus medicated, Loughner would likely become competent to stand trial. The logical flaw here is obvious: One cannot decide whether Loughner should be committed to restore competency by assuming an administrative medication decision that rested on the premise that he is already an inmate of the institution and needs to be medicated while there.[5]
*782 Further, to justify its analysis, the majority holds that whenever dangerousness is the ground for involuntary medication— whether pre- or post-trial, and whether with the ultimate aim is restoration to competency or not — Harper governs entirely as to both the substantive and procedural safeguards. Why that should be so, we are not told. In particular, we are not told why the question of the propriety of involuntary medication on dangerousness grounds can be relegated to an administrative proceeding when: (1) it is the court that must decide whether Loughner is to be medically treated so as to be restored to competency; and (2) its decision in that regard depends on the availability of involuntary medication.
A. Sell and its Progeny
To my mind, Sell goes almost all of the way toward establishing that where, as here, the involuntary medication decision is embedded in a pretrial judicial decision concerning restoration of competency, the court must decide whether the defendant is to be involuntarily medicated. Sell does not address the precise situation here, in which there was a previous mid-commitment administrative involuntary medication decision.[6] But it does establish the proposition that a court must itself address the involuntary medication issue when, as here, the government’s ultimate aim is restoration of competency, and the court is deciding the propriety of treatment toward that end. Because the relevant passage from Sell is singularly important to the correct disposition of this case, and is brushed aside by the majority, I quote it at length:
We emphasize that the court applying these standards is seeking to determine whether involuntary administration of drugs is necessary significantly to further a particular governmental interest, namely, the interest in rendering the defendant competent to stand trial. A court need not consider whether to allow forced medication for that kind of pur *783 pose, if forced medication is warranted for a different purpose, such as the purposes set out in Harper related to the individual’s dangerousness, or purposes related to the individual’s own interests where refusal to take drugs puts his health gravely at risk. There are often strong reasons for a court to determine whether forced administration of drugs can be justified on these alternative grounds before turning to the trial competence question.
[Cjourts typically address involuntary medical treatment as a civil matter, and justify it on these alternative, Harper-type grounds. Every State provides avenues through which, for example, a doctor or institution can seek appointment of a guardian with the power to make a decision authorizing medication — when in the best interests of a patient who lacks the mental competence to make such a decision. And courts, in civil proceedings, may authorize involuntary medication where the patient’s failure to accept treatment threatens injury to the patient or others. If a court authorizes medication on these alternative grounds, the need to consider authorization on trial competence grounds will likely disappear. Even if a court decides medication cannot be authorized on the alternative grounds, the findings underlying such a decision will help to inform expert opinion and judicial decisionmaking in respect to a request to administer drugs for trial competence purposes.
Sell, 539 U.S. at 181-83, 123 S.Ct. 2174 (emphases added) (citations omitted).
The rhythmically insistent pulse of Sell’s refrain — “A court need not consider.... There are often strong reasons for a court to determine.... [Cjourts typically address .... If a court authorizes.... Even if a court decides.... ” — repeatedly reinforces the command that a court, “asked to approve forced administration of drugs for purposes of rendering a defendant competent to stand trial,” should itself begin by determining whether the drugs may be justified on alternative, Harper-type substantive grounds. See id. at 183, 123 S.Ct. 2174. In other words, Sell recognized that the substantive reasons for an involuntary medication order and the applicable procedural protections are not necessarily tied together in discrete packages. Instead, where an ultimate judicial decision concerning medical treatment toward restoration of competency turns on involuntary medication, the court can vary the substantive ground for ordering involuntary medication, but must itself determine whether involuntary medication is appropriate on some proper basis.
Sell does not stand alone in this regard. Its predecessor, Riggins v. Nevada, 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992), stated that the government “certainly would have satisfied due process if the prosecution had demonstrated, and the District Court had found, that treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of Riggins’ own safety or the safety of others.” Id. at 135, 112 S.Ct. 1810 (emphasis added) (citations omitted). Although this sentence from Riggins does not, as Loughner maintains, adopt as a holding the requirement of a no-less-intrusive-alternative finding, it does presage Sell’s insistence that, whatever the substantive standard is, the pertinent finding, even as to medication for dangerousness, be made by a court, where that finding is an alternative to medication for trial competency purposes and restoration is the likely result.
Justice Kennedy’s concurrence in Rig-gins reinforces this point, explicitly reject *784 ing the analytical bifurcation of involuntary medication and trial-related proceedings. “I cannot accept the premise ... that the involuntary medication order comprises some separate procedure, unrelated to the trial and foreclosed from inquiry or review in the criminal proceeding itself,” Justice Kennedy wrote, “To the contrary, the allegations pertain to the State’s interference with the trial.” Riggins, 504 U.S. at 139, 112 S.Ct. 1810 (Kennedy, J., concurring in the judgment). Similarly, I cannot, especially in light of Sell, accept the proposition that the involuntary medication order can be a separate, administrative procedure, even though the judicial commitment proceeding is part of the overall criminal prosecution and concerns whether Loughner can be restored to competency to stand trial through involuntary medication.
Our own cases similarly suggest that a court, asked to authorize restoration of a pretrial detainee to trial competency through mandatory administration of drugs, must itself determine whether medication can be justified on dangerousness grounds. In United States v. Hernandez-Vasquez, 513 F.3d 908 (9th Cir.2008), we stated that “the district court, in an ordinary case, should refrain from proceeding with the Sell inquiry before examining dangerousness and other bases to administer medication forcibly,” and added that the court should state its reasons for not proceeding under Harper if it chose to advance directly to the Sell analysis. Id. at 914 (emphasis added). Moreover, we cautioned that, “[o]n remand, the district court.... should take care to separate the Sell inquiry from the Harper dangerousness inquiry and not allow the inquiries to collapse into each other” — an instruction that would have made little sense if we had expected the prison to conduct the Harper hearing. Id. at 919; see also United States v. Rivera-Guerrero, 426 F.3d 1130, 1138 n. 4 (9th Cir.2005) (stating that “the district court should have conducted a Harper dangerousness hearing instead of proceeding under Sell”) (emphasis added).[7]
Thus, where the government has asked the district court to authorize the detainee’s restoration through involuntary medication, Sell and its progeny require the court to determine whether a pretrial detainee may be involuntarily drugged on dangerousness grounds, if that appears to be a feasible alternative to involuntary medication on restoration grounds alone. That is, of course, precisely what has happened here.

B. The Interwoven Medication and Commitment Decisions

Apart from brushing aside Sell and our related cases with regard to the need for a judicial decision whenever the ultimate aim is restoration of competency, the majority attempts to distinguish this case from Sell by separating the involuntary medication decision from the decision that Loughner could be restored to competency within a reasonable period of time if committed for treatment at FMC-Springfield. But the two issues cannot be disentangled in this manner.
18 U.S.C. § 4241(d)(2)(A) focuses the commitment for treatment inquiry on the *785 likelihood of the detainee’s restoration after the treatment. Obviously, a judge cannot meaningfully decide whether restoration to trial competency as a result of treatment is likely without knowing what treatment is contemplated. And equally obviously, where the treatment contemplated is the administration of involuntary psychotropic medication, the detainee’s prospects for restoration depend on the propriety of an order authorizing involuntary medication. Thus, as the majority acknowledges, the “involuntary medication decision is important to the overall outcome of the § 4241(d)(2) proceeding because it ‘likely affect[s] both the scope and term of a § 4241(d)(2) order.’ ” Majority Op. at 767 (quoting United States v. Magassouba, 544 F.3d 387, 418 n. 27 (2d Cir .2008)).
What the majority does not acknowledge, however, is that the involuntary medication order itself depends on the detainee’s commitment. Certainly, a defendant would not be subject to involuntary medication were he released from government custody. Were he instead simply transferred from a mental health treatment facility to an ordinary pretrial detention center, changes to the circumstances of his confinement would necessitate a new involuntary medication proceeding to determine whether the inmate poses a danger to himself or others in the context of his new confinement.[8] Thus, the district court’s decision to extend Loughner’s commitment for the purpose of effecting his restoration both required and enabled the administration of involuntary medication. Under these circumstances, the prior administrative involuntary medication decision, made while Loughner was already committed to FMC-Springfield for a limited period and for a different purpose than is now at issue, cannot simply be assumed valid and treated as a background condition of the commitment decision.

C. The Reasons for Requiring Judicial Authorization of Involuntary Medication

I would therefore view the § 4241(d)(2)(A) commitment proceeding as functionally indistinguishable from the involuntary medication decision in Sell. And, as I have shown, Sell and our later cases could not be more clear in directing that, where restoration of trial competency is the ultimate goal, any decision to medicate involuntarily a pretrial detainee, even on dangerousness grounds, must be made in a judicial proceeding. As Sell does not elaborate on why that is so in any detail, I do so now, with particular attention to the circumstances we face. I conclude that, at the point at which a decision must be made concerning the detainee’s commitment for restoration of competency to stand trial, the relative advantages of judicial involvement in the involuntary medication decision and concern for the impact psychotropic medication may have on the detainee’s fair trial rights both counsel in favor of requiring the district court itself to resolve the involuntary medication issue, whether on dangerousness or other *786 grounds. I review each of these considerations in turn.
i. The Benefits and Costs of Judicial Involvement
In deciding that a convicted, incarcerated prisoner is not entitled to a judicial hearing regarding the involuntary medication decision, Harper expressed significant concern over “the fact that requiring judicial hearings will divert scarce prison resources, both money and the staffs time, from the care and treatment of mentally ill inmates.” Harper, 494 U.S. at 232, 110 S.Ct. 1028. The Court also reasoned that these additional costs were not justified, given the specifically medical nature of the inquiry and the absence of any reason to doubt the administrative decisionmaker’s impartiality. See id. at 233-35 & n. 13, 110 S.Ct. 1028. In the quite different context of a judicial decision concerning pretrial treatment for restoration of competency, focused on the detainee’s prospects for restoration of capacity to stand trial, there are several important purposes served by, and few reasons for avoiding, judicial resolution of the involuntary medication for dangerousness issue.
First, unlike the Harper context, in which the inmate has been convicted and is incarcerated for the term of his sentence, the marginal costs of judicial inquiry into the involuntary medication issue are minimal. A judicial hearing is required anyway for purposes of determining the propriety of treatment for restoration of competency.
Here, for example, the district judge, counsel for both parties, Loughner’s treating psychologist (Dr. Pietz), a government expert witness with a background in clinical psychiatry (Dr. Ballenger), and Loughner himself were all present in the courtroom for the district court’s September 28 commitment hearing. Concomitantly, the issues pertaining to Loughner’s commitment for restoration (e.g., his likely reaction to psychotropic drugs, the need to continue medication throughout the extended commitment period, and so on) are closely related to the issues pertaining to whether he may be medicated involuntarily for dangerousness to self or others.
If Loughner’s attorneys had been permitted to inquire at the September 28 hearing into the propriety of forced medication on dangerousness grounds, they could conceivably have established that such medication was not justified, and so treatment on that ground would not be the basis for any conclusion that Loughner could, if committed, be restored to competency in a reasonable period of time. The marginal difficulty of requiring the court to explore whether Loughner’s involuntary medication is justified on dangerousness grounds, in addition to determining whether that medication, if administered, will likely restore his trial competency, would be immeasurably less than for a convicted prisoner, as to whom no legal proceedings at all are ongoing, much less proceedings focused on matters closely related to, and dependent upon, the involuntary medication determination.
Nor would requiring judicial determination in the present context encroach on the prerogative of the prison’s medical staff. Like the criminal defendant in Riggins and the pretrial detainee in Sell, Loughner was already in the midst of government-initiated judicial proceedings that dealt explicitly with legal issues relating to his involuntary medication (i.e., whether the medication is likely to restore him to the capacity to permit the proceedings to go forward). See Sell, 539 U.S. at 175, 123 S.Ct. 2174; Riggins, 504 U.S. at 139, 112 S.Ct. 1810 (Kennedy, J., concurring in the judgment). Because the government has itself opened the door to judicial proceed *787 ings relating to involuntary medication, its professed concerns about judicial encroachment on matters of prison administration carry significantly less weight.
Moreover, where, as for the commitment decision, the question of the propriety of medication for dangerousness is embedded in an inquiry into the likelihood of restoration of competency, the district court is no worse placed, and in some respects better placed, than the prison’s medical staff to render an objective and impartial decision. For one thing, FMC-Springfield’s physicians are, like most physicians, professionally disposed to favor medical treatment. The district court recognized as much when it acknowledged that Loughner’s physicians may be overly optimistic in forecasting his prospects for restoration through involuntary medication. “They’re doctors,” the court observed, “They want to help and heal people.”
Doctor Tomelleri’s involuntary medication orders bear out the district court’s observation. The Harper I, Harper II, and Harper III orders repeatedly rejected less-intrusive measures, such as seclusion and physical restraints, because they have “no direct effect on mental illness,” and justified the use of psychotropic medication on the grounds that only the psychotropic drugs “address the fundamental problem.” Doctor Tomelleri’s preoccupation with treating Loughner’s underlying mental illness, although professionally appropriate, could have significantly clouded his judgment as to whether the drastic measure of involuntary psychotropic medication was justified under the temporary detention circumstances.
This skew may well have influenced the original involuntary medication decision, which was premised on dangerousness to others. At that point, Loughner’s manifestations of dangerousness consisted of throwing some plastic chairs against a metal grill and a wall, throwing some toilet paper at a camera, and spitting and “lunging” at his attorneys (a characterization the attorneys dispute, but as to which there has been no evidentiary hearing). Although very likely manifestations of serious mental illness, these incidents do not appear to have endangered anyone and would be most unlikely, I would think, to have triggered involuntary psychotropic medication — as opposed to physical security measures — in most incarceration contexts. See Weston, 206 F.3d at 13.
Further, Loughner’s FMC-Springfleld physicians in particular are, unlike physicians in other jail and prison settings, charged with additional duties that could color their medication for dangerousness decision. FMC-Springfield was previously charged with treating Loughner as necessary “to determine whether there is a substantial probability” that he can be restored to competency, 18 U.S.C. § 4241(d)(1), and is now charged with treating Loughner for the express purpose of restoring him to competency. See 18 U.S.C. § 4241(d)(2)(A). Where, as here, the detention facility’s medical staff perceive involuntary medication as “the only option for restoring [the detainee] to competency,” the institutional responsibility to restore competency if possible is likely to color the medical staffs deliberations regarding involuntary medication on any grounds.
Indeed, there is some indication that this confusion of roles occurred with respect to FMC-Springfield’s involuntary medication decisions in this case. For example, Loughner’s Notice of Medication Hearing and Advisement of Rights form, filled out by Dr. Pietz, stated: “Reason for Treatment: Mr. Loughner suffers from a mental illness and refused to take the medication prescribed to him. He was referred to this facility to restore compe *788 tency.” Contrary to the district court’s observation that Loughner’s prison physicians “remain free to find that he cannot be, or has not been restored,” the language of Loughner’s notice form suggests Dr. Pietz believed that Loughner was sent to FMC-Springfield “to restore competency” (which was not true; the commitment was for evaluation, see 18 U.S.C. § 4241(d)(1)) and that the purpose of involuntary medication was to restore Loughner’s competency for trial, not to treat dangerousness.[9] Such instances support the conclusion that the district court may be better placed than the prison’s administrative decision-makers to render an objective decision on the involuntary medication of a pretrial detainee for purposes of dangerousness to self.
Although the majority suggests otherwise, Majority Op. at 755-56 (citing Harper, 494 U.S. at 233-34, 110 S.Ct. 1028), this particular structural conflict theory did not come into play in Harper. In the postconviction context, the prison’s administrative decisionmakers did not confront any statutory restoration obligations that could potentially interfere with the “necessary independence to provide an inmate with a full and fair hearing.” See Harper, 494 U.S. at 233, 110 S.Ct. 1028.
The majority also suggests that the courts are ill-suited for making medical judgments about a detainee’s medication treatment and should avoid doing so wherever possible. Majority Op. at 755. Courts are not institutionally disabled from deciding such questions. As Sell recognized, they “typically address involuntary medical treatment as a civil matter, and justify it on these alternative, Harper-type grounds.” Sell, 539 U.S. at 182, 123 S.Ct. 2174; see also, e.g., Kulas v. Valdez, 159 F.3d 453, 455-56 (9th Cir.1998). For example, the criteria courts must apply in determining whether a federal criminal defendant may be civilly committed strongly resemble the criteria applied by the Bureau of Prisons’ administrative decision-makers in Harper proceedings. Compare 18 U.S.C. § 4246(d) with 28 C.F.R. 549.46(a)(7). Indeed, the district court’s decision to extend Loughner’s commitment itself involved a medical judgment as to the likelihood that Loughner’s current regimen of psychotropic medication will successfully induce his restoration within the authorized period. If we can trust the court’s acumen to determine, after an evidentiary hearing at which experts appear, that a certain medication regimen is likely to restore Loughner’s capacity to stand trial, there is no reason simultaneously to distrust that same court’s ability to ascertain whether that same medication is needed to make him less dangerous to himself or others.
ii. The Concern for Fair Trial Rights
Central to the holding in Sell was the understanding that the side-effects associated with psychotropic medication may severely prejudice a defendant’s right to receive a fair trial. Here, for example, Dr. Pietz testified that Loughner has developed a flat, emotionless aspect since resuming psychotropic medication. The district court further observed that Loughner “did appear to be tired” at the commitment proceeding and “did appear to close his eyes from time to time today and *789 maybe a little sleepy or nod off.” This “sedation-like effect” may result in “serious prejudice” during trial proceedings “if medication inhibits [Loughner’s] capacity to react and respond to the proceedings and to demonstrate remorse or compassion.” Riggins, 504 U.S. at 143-14, 112 S.Ct. 1810 (Kennedy, J., concurring in the judgment). “The tendency of psychotropic medication to flatten or deaden emotional responses” could prove particularly damaging if the government seeks the death penalty, as it very well might in this case, because “the jury would then be especially sensitive to [Loughner’s] character and any demonstrations of remorse (or lack thereof).” Weston, 206 F.3d at 20 (Tatel, J., concurring).
Even the intended effects of psychotropic drugs may infringe Loughner’s fair trial rights. Assuming Loughner will put on an insanity defense, manifestations in court of how his mind works may well be his own best evidence. Because psychotropic medication chemically alters the brain, it “deprives the jury of the opportunity to observe the defendant in the delusional state he was in at the time of the crime.” Id. at 21 (Tatel, J., concurring). The government’s decision to restore Loughner’s trial competency may therefore prevent him from putting on his chosen defense, by altering the material evidence for that defense. See Riggins, 504 U.S. at 139, 142, 112 S.Ct. 1810 (Kennedy, J., concurring in the judgment).[10] Thus, both the intended and unintended effects of psychotropic medication can conceivably deprive a criminal defendant of his right to a fair trial.
There is no point in restoring a defendant’s trial competency, through commitment to a medical facility and involuntary administration of psychotropic medication, if the means necessary to effect restoration will so infringe the defendant’s fair trial rights as to render the trial itself unconstitutional. That is why Sell requires a court to find, before ordering involuntary medication on trial competency grounds, that the involuntary medication to be administered is both substantially likely to render the defendant competent to stand trial and substantially unlikely to create side-effects that would render his trial unfair. See Sell, 539 U.S. at 181, 123 S.Ct. 2174 (citing Riggins, 504 U.S. at 142-45, 112 S.Ct. 1810 (Kennedy, J., concurring in the judgment)). Only then, the Court observed, will the medication sufficiently advance the trial-related interests put forward to justify depriving the defendant of his liberty to reject medical treatment. See id. And, although the Court did not expressly so state, the possible impact of involuntary medication on the ultimate trial explains Sell’s repeated insistence on the need for a court to determine the need for involuntary medication on grounds of dangerousness where restoration of trial competency is the government’s ultimate goal. See id. at 181-83, 123 S.Ct. 2174.
Given the particular circumstances of this case — namely, a commitment proceeding governed by 18 U.S.C. § 4241(d)(2)(A) — there is the same need for a judicial determination as to how the psychotropic drugs will likely impact Loughner’s fair trial rights, even though dangerousness to self is the immediate reason for his involuntary medication. To commit Loughner for the purpose of resto *790 ration, the court must conclude that there is a “substantial probability” that he “will attain the capacity to permit the proceedings to go forward” during the commitment period. See 18 U.S.C. § 4241(d)(2)(A). Thus, § 4241 requires the court to focus on whether Loughner’s commitment is likely to advance the prosecution’s trial-related interests. Pretrial commitment for restoration of competency will likely not “permit the [trial] proceedings to go forward” if Loughner can only be restored through means likely to render any resulting trial unfair. So the district court may only commit Loughner for restoration of trial competency if it concludes that the psychotropic means through which his restoration is to be accomplished are substantially unlikely to infringe his fair trial rights.[11]
Of course, at the time of the § 4241(d)(2)(A) commitment hearing, there may not be sufficient evidence to support the conclusion that involuntary psychotropic medication will render the trial unfair. But that should not excuse the district court from its responsibility to evaluate the evidence that is available according to its own best lights, providing “both the defendant, whose right to present a defense may be infringed by involuntary medication, and the government, whose eventual prosecution of the defendant may be foreclosed because of the infringement,” with the best available “premedication resolution of the Sixth Amendment issue.” Weston, 206 F.3d at 14. If the district court concludes that there is insufficient evidence to reach a final conclusion on the impact involuntary medication will have on the defendant’s fair trial rights, it could simply defer the issue until some later, pre-trial date. See id. at 21 (Tatel, J., concurring). The government would then, however, bear the risk that the court might bar criminal prosecution if it subsequently concludes that the drugs have infringed the defendant’s fair trial rights. Regardless of whether the court had sufficient evidence to resolve Loughner’s fair trial rights concerns at the time of the commitment hearing, however, the inquiry is not, as the majority asserts, “premature and irrelevant at this stage.” Majority Op. at 769.

D. Conclusion

In short, I would hold that a district court asked to commit a pretrial detainee for the purpose of restoring his trial competency through involuntary medication must itself determine whether involuntary medication is justified. In doing so, it should first consider, as in Sell, whether the medication is justified on grounds of dangerousness to self or others. If the court concludes that involuntary medication is justified, it may then proceed to determine whether involuntary medication is likely to restore the detainee’s capacity to such a point that trial may proceed. But I would require the court to determine, as part of that inquiry, whether the contemplated treatment is substantially unlikely to infringe the detainee’s fair trial rights. I cannot agree with the majority’s conclusion that the district court could au *791 thorize Loughner’s commitment under § 4241(d)(2)(A) on the bare determination that the medication he is currently receiving is likely to restore his purely cognitive trial competency, meaning the ability to appreciate the course of the proceedings and confer with counsel, with no consideration of either the medication’s propriety or its potential effect on his fair trial rights.
III. The Involuntary Medication Order
Because I conclude that the district court was obligated itself to decide anew the involuntary medication issue in conjunction with its § 4241(d)(2)(A) commitment determination, I consider the propriety of the prison’s Harper III involuntary medication order moot in all relevant respects. I nevertheless proceed to review the deficiencies I see in those proceedings, for two reasons.
First, in reviewing the administrative involuntary medication order, I wish to clarify the substantive standards and associated requirements I believe must be applied by the district court in deciding whether involuntary medication is justified on dangerousness grounds.
Second, I disagree with the majority’s conclusion that the Harper III involuntary medication order otherwise satisfies the demands of substantive and procedural due process. Setting aside my conviction that the procedural posture of this case requires a court to adjudicate the merits of Loughner’s involuntary medication, I agree that a mid-commitment medication decision on dangerousness grounds need not be made by a judge. Where an otherwise proper judicial commitment decision has already been made, either for a certain period or indefinitely, it is appropriate to regard direct judicial intervention, even pretrial, as both unnecessary and burdensome. Moreover, in that circumstance, the penological and liberty interests are similar, in many respects, to those that pertain post-conviction. But despite that basic procedural agreement, I would hold that the Harper III involuntary medication order cannot stand, given its substantive and procedural shortcomings.

A. Substantive Due Process

i. Modifications to the Harper Standard
I agree with the majority’s conclusion that involuntary medication may be justified even if it is not necessarily the least restrictive alternative. The so-called “Rig-gins standard,” put forth by Loughner to justify the least restrictive alternative requirement, simply does not exist; Riggins rejected the opportunity to “finally prescribe such substantive standards.” 504 U.S. at 136, 112 S.Ct. 1810. In light of Sell’s command to determine whether medication is justified on Harper-type grounds prior to deciding whether medication is justified to restore competency, 539 U.S. at 183, 123 S.Ct. 2174, I do not dispute the application of Harper’s substantive standard, broadly construed, to the decision to medicate a pretrial detainee for dangerousness to self or others.
Harper’s substantive due process standard was, however, expressly predicated on the particular circumstances of a convicted prisoner’s confinement. See Harper, 494 U.S. at 222, 110 S.Ct. 1028. It must therefore be modified to accommodate the pretrial context of Loughner’s confinement.
Harper identified three general factors as particularly important to assessing the constitutional validity of a prison regulation authorizing the use of involuntary medication: (1) the existence of a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) the impact accommodation of the asserted *792 constitutional right would have on guards and other inmates, and on the allocation of prison resources generally; and (3) the availability of “ready” alternatives. 494 U.S. at 224-25, 110 S.Ct. 1028. The pretrial context of Loughner’s confinement significantly affects our application of these factors, in at least two respects.
First, Loughner’s status as a pretrial detainee narrows the scope of the government’s legitimate interests in restricting his constitutional rights. Where the government seeks to medicate involuntarily a convicted prisoner, its legitimate long-term correctional interests countervail, to a degree, the prisoner’s liberty interest in avoiding the intended, mind-altering effects of psychotropic medication. The federal sentencing standards, for example, recognize that “correctional treatment,” including appropriate medical care, can be legitimately imposed on a convicted defendant. See 18 U.S.C. § 3553(a)(2)(D); 18 U.S.C. § 3563(b)(9). When the government seeks to medicate a convicted prisoner on dangerousness grounds, these treatment interests provide a modicum of justification for preferring long-term, systemic correction, through involuntary psychotropic medication, of the mental illness causing the convict’s dangerousness, over temporary interventions that will not alleviate the condition causing the dangerousness. See Harper, 494 U.S. at 225, 110 S.Ct. 1028.
The government may not, however, assert such correctional interests as a justification for restricting the constitutional rights of a pretrial detainee. We have recognized that “[a]ll legitimate intrusive prison practices have basically three purposes: the preservation of internal order and discipline, the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners.” United States v. Hearst, 563 F.2d 1331, 1345 n. 11 (9th Cir.1977) (per curiam) (internal quotation marks omitted). The first two interests, which are regulatory in nature, may be asserted as legitimate justifications for restricting the constitutional rights of pretrial detainees, but the government’s correctional interest in punishment or rehabilitation may not. Id.; see, e.g., Bell v. Wolfish, 441 U.S. 520, 537, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); Mauro v. Arpaio, 188 F.3d 1054, 1065 (9th Cir.1999). Instead, “the Due Process Clause requires conditions of pretrial confinement to be analyzed according to whether they are appropriate to ensure the detainees’ presence at trial and to maintain the security and order of the detention facility.” Halvorsen v. Baird, 146 F.3d 680, 689 (9th Cir.1998). As Halvorsen observed, these principles are of ancient vintage. See id. Blackstone, for example, wrote that pretrial detention “is only for safe custody, and not for punishment: therefore, in this dubious interval between the commitment and trial, a prisoner ought to be used with the utmost humanity; and neither be loaded with needless fetters, or subjected to other hardships than such as are absolutely requisite for the purpose of confinement only.” IV William Blackstone, Commentaries on the Laws of England 297 (1769) (quoted by Halvorsen, 146 F.3d at 689).
Second, the temporary context of Loughner’s pretrial confinement means that inquiry into the effectiveness and cost-efficiency of involuntary medication as compared to alternatives must be limited to the relative short-term. Some alternatives may be more appropriate than involuntary psychotropic medication if they are equally effective and cost-efficient over that short-term, even if they will not affect the detainee’s long-term dangerousness. So, while Harper rejected physical restraints as an acceptable substitute for involuntary medication in part because *793 “[physical restraints are effective only in the short term,” 494 U.S. at 226, 110 S.Ct. 1028, that rejection might not carry over in some pretrial contexts. Involuntary medication may therefore be appropriate as a long-term solution for a dangerous, mentally-ill convicted prisoner and yet inappropriate as a short-term solution for a dangerous, mentally-ill pretrial detainee.
In light of these adjustments of perspective appropriate to the pretrial context, I am skeptical that the prison’s asserted justification for involuntary medication could carry the day on the present record.[12] Doctor Tomelleri concluded that psychotropic medication is justified because it “is the treatment of choice for conditions such as Mr. Loughner is experiencing,” and rejected various alternatives because they are “merely protective temporary measures with no direct effect on the core manifestations of the mental illness.” But, in the pretrial context, “protective temporary measures” may be precisely what is called for, and there may therefore be no cognizable governmental interest in addressing “the core manifestations of the mental illness.” Doctor Tomelleri’s justifications thus demonstrate a misapprehension of the appropriate inquiry in the pretrial context.[13]
This criticism is not meant to presage that the outcome of the medication for dangerousness-to-self inquiry in the pretrial context is foreordained. Instead, it is to say that attention to the particular circumstances of a specific pretrial detainee is essential in determining whether there are ready alternatives to medication. In Loughner’s case, those circumstances might include the likely significant length of the pretrial period, as well as the needs and capabilities of the mental health facility to which he is committed.
ii. Specificity of Proposed Treatment
Harper instructed that a decision to medicate involuntarily must be medically appropriate. See Harper, 494 U.S. at 227, 110 S.Ct. 1028. Sell, which incorporated Harper’s medical appropriateness requirement, observed that “[djifferent kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success.” Sell, 539 U.S. at 181, 123 S.Ct. 2174. Interpreting the medical appropriateness requirement in United States v. Hemandez-Vasquez, we observed that “Sell’s discussion of specificity would have little meaning if a district court were required to consider specific drugs at a Sell hearing but then could grant the Bureau of Prisons unfettered discretion in its medication of a defendant.” 513 F.3d at 916. *794 We therefore held that, to satisfy the medical appropriateness requirement, “the district court’s order must identify: (1) the specific medication or range of medications that the treating physicians are permitted to use in their treatment of the defendant, (2) the maximum dosages that may be administered, and (3) the duration of time that involuntary treatment of the defendant may continue before the treating physicians are required to report back to the court on the defendant’s mental condition and progress.” Id. at 916-17.
We have never identified the government’s purpose in seeking involuntary medication, whether dangerousness or trial competency, as a relevant factor in applying the medical appropriateness requirement. Instead, we have assumed that the same requirement for a specific treatment plan applies in both contexts. In United States v. Williams, 356 F.3d 1045 (9th Cir.2004), for example, we applied the medical appropriateness requirement, under the Harper standard, to a supervised release condition that required the convict to take antipsychotic medication under threat of reincarceration. Id. at 1056-57. And in Rivera-Guerrero, we held that Williams’s interpretation of the medical appropriateness requirement applies to the medical appropriateness inquiry under Sell. See 426 F.3d at 1137 (citing Williams, 356 F.3d at 1056). Hernandez-Vasquez should therefore apply with equal force in all involuntary medication contexts.
Moreover, the reasons supporting a specification requirement in the Sell context apply with equal force where medication is justified on dangerousness grounds. Sell proceeded from that premise, stating that “[t]he specific kinds of drugs at issue may matter here as elsewhere.” Sell, 539 U.S. at 181, 123 S.Ct. 2174 (emphasis added). With no specific limits — or at least prescribed ranges or categories — covering the types, dosages, and duration of a patient’s involuntary medication, Dr. Tomelleri could not meaningfully evaluate the medication proposal, as compared to alternatives (including an alternative medication regime). This particularized focus, for reasons already noted, is of special importance with regard to pretrial medication for dangerousness. In this context, the governmental interest in long-term correction evaporates: Drugs with serious side effects, though appropriate where ultimate cure is the goal, may not be medically indicated (or may be indicated in lower doses) for elimination of symptoms alone.
The majority maintains that cabining the discretion of Loughner’s treating physicians in this way would prevent them from adjusting his medication regimen to changing circumstances. This concern was addressed by Hemandez-Vasquez. In that case, we held that the specifications in the involuntary medication order “should be broad enough to give physicians a reasonable degree of flexibility in responding to changes in the defendant’s condition,” and noted that the government or the defendant “may move to alter the court’s order as the circumstances change and more becomes known about the defendant’s response to the medication.” 513 F.3d at 917.[14]
I would therefore hold that an involuntary medication order premised on dangerousness to self or others, like an order *795 premised on restoration to competency, must identify the types, maximum dosages, and estimated duration of an inmate’s involuntary medication. In the procedural regime I favor for this case, in which the involuntary medication decision would be made as part of the proceedings concerning commitment for restoration of competency, the order could provide substantial medical flexibility; in the administrative regime the majority presupposes, the order can be more focused, as adjustments can be accomplished on site and through the facility’s independent hearing officer(s). The policy approved in Harper operated in just this way, providing regular review by the administrative hearing committee as to both the type and dosage of the drugs to be administered. See Harper, 494 U.S. at 216, 232-33, 110 S.Ct. 1028.
Because Dr. Tomelleri did not tailor his analysis to the temporary, nonconviction, pretrial context, and did not provide specific directions to Loughner’s treating physicians regarding the types of drugs, the maximum dosages to be administered, or the estimated duration of involuntary medication, I would hold that FMC-Springfield did not properly determine whether involuntary medication was medically appropriate, even for the period of Loughner’s prior commitment.

B. Procedural Due Process

i. Periodic Review
Both the predecessor to the currently operative regulation and the state policy at issue in Harper contained provisions requiring periodic administrative review of an inmate’s involuntary medication. See 57 Fed.Reg. 53820-01, 1992 WL 329581 (Nov. 12, 1992); Harper, 494 U.S. at 216, 232-33, 110 S.Ct. 1028. The present regulation, 28 C.F.R. § 549.46, does not include such a periodic review requirement. The majority, concluding that periodic review is not constitutionally required, holds that its absence does not render 28 C.F.R. § 549.46 constitutionally infirm. Majority Op. at 753-54.
I disagree. Harper concluded that a judicial hearing might “not be as effective, as continuous, or as probing as administrative review using [the prison’s] medical decisionmakers,” in part because the state policy at issue required the administrative hearing committee to “review[ ] on a regular basis the staffs choice of both the type and dosage of drug to be administered.” See id. at 232-33,110 S.Ct. 1028 (emphasis added). Such continuity is especially important because involuntary medication is, as the majority notes, “a fluid process” that “must be adjusted depending on how the patient reacts and why [sic], if any, side effects are experienced.” Majority Op. at 767. Under such circumstances, periodic review is necessary to ensure the continued accountability of the inmate’s treating physicians.
The majority maintains that the short-term context of a pretrial detainee’s confinement alleviates the need for periodic review. Majority Op. at 753. Not so, or at least, not necessarily. Pretrial confinement, although inherently temporary, is not inherently brief. In Rivera-Guerrero, for example, we observed that the defendant had been committed at FMC-Springfield for nearly two years and had been involuntarily treated with antipsychotic medication for approximately one year. 426 F.3d at 1143. In United States v. Weston, 326 F.Supp.2d 64 (D.D.C.2004), the district court authorized an additional six-month commitment, even though defendant had already been committed for roughly five years and had been treated with involuntary medication for two and one half years. See id. at 67. I cannot reconcile the concept of due process with *796 the conclusion that a pretrial detainee maybe involuntarily treated with psychotropic medication for several years on the basis of a single administrative hearing.[15]
In this case, I am concerned that Loughner’s deterioration after the discontinuation of medication in July will be used to justify involuntary medication for years on end. I find this possibility deeply troubling both because the absence of periodic review deprives Loughner of the opportunity to demonstrate that he no longer needs medication, or as much medication, and because the true causes of Loughner’s psychological deterioration remain murky. The particular symptoms provoking particular concern for Loughner’s own safety were not observed before his medication was suddenly withdrawn. On the record made available to us, it is impossible to ascertain whether the rapid deterioration Loughner experienced in July was caused by the emergence of his underlying mental illness, by the jarring manner in which his medication was discontinued, or, perhaps, by the imposition of the rigors of a suicide watch. Periodic administrative review could perhaps (although not necessarily) mitigate some of these causation concerns by providing for routine reevaluation of the need for involuntary psychotropic medication, as well as the type and amount of medication prescribed.
ii. Right to Counsel
On my preferred approach, the involuntary medication determination in this case would have been made in court, and Loughner’s ordinary right to full representation by counsel would pertain. But even for mid-commitment dangerousness determinations made pretrial, I disagree with the majority’s conclusion that Loughner is not entitled to the assistance of counsel, to a limited extent, in connection with the administrative involuntary medication hearing. Majority Op. at 756.
As the majority points out, Harper held (in the post-conviction context) that lawyers are not necessary participants is an administrative involuntary medication determination, because their legal expertise bears no relation to the relevant medical judgment. See Harper, 494 U.S. at 236, 110 S.Ct. 1028. In the pretrial context, however, there is, as pointed out earlier, heightened potential for legal confusion among the detention facility’s physicians as to both their statutory responsibilities and the proper purpose of an administrative involuntary medication order. Here, for example, Loughner’s treating psychologist initially viewed competency restoration as the primary purpose of Loughner’s involuntary medication, and the involuntary medication decisions seem focused on long-term cure rather than short-term safety. See supra Section II(C)(i).
Staff representatives are insufficient protection against such confusion. They lack the requisite legal expertise and, as here, often do not assert themselves in the medication hearing. See Morgan, 193 F.3d at 266; United States v. Humphreys, 148 F.Supp.2d 949, 953 (D.S.D.2001); United States v. Weston, 55 F.Supp.2d 23, 26-27 (D.D.C.1999). Moreover, and critically, lawyers for pretrial detainees are in the process of preparing and implementing an overall defense strategy. As that strategy will often be influenced by the events during, and results of, a medication hear *797 ing, excluding lawyers from any involvement in that hearing constitutes an impediment to the right to counsel with regard to the impending prosecution. A misstep at the administrative medication hearing could well impact the ultimate likelihood of conviction in a manner that could be foreseen by the defendant’s lawyer but not by the defendant — a lay person who is, by definition, incompetent — or the lay staff representative. Thus, pretrial detainees have a significantly greater interest in the right to counsel than convicted prisoners.
Conversely, the government’s interest in excluding counsel from the administrative hearing is weaker with regard to a pretrial detainee than with respect to a convicted prisoner. In the pretrial context, there is no punitive or rehabilitative interest in isolating the inmate from society generally. That is why, in the pretrial context, “part of the process due to a person if his liberty is taken is the opportunity to communicate with someone outside the institution where he is held, at a time and in a manner consistent with practical management of booking and confinement procedures and institutional security and order.” Halvorsen, 146 F.3d at 689.
Given the different balance of interests in the context of pretrial confinement for restoration, I would hold that a pretrial detainee has a limited right to the participation of counsel in connection with the administrative involuntary medication hearing. Briefly sketching the contours of this right, I would hold that the prison must: (1) notify the pretrial detainee’s counsel of its intention to conduct an involuntary medication hearing, as well as the types, maximum dosages, and expected duration of the proposed involuntary medication; (2) provide the detainee’s counsel an opportunity to confer with the staff representative prior to the involuntary medication hearing; and (3) allow the detainee’s counsel to observe the involuntary medication hearing or, if there is a good reason to exclude the attorney from the proceedings, provide an audiovisual recording of the hearing.
Providing the detainee’s counsel with notice of the involuntary medication hearing and an opportunity to confer with the staff representative would allow counsel to apprise the staff representative of relevant legal issues, including: the importance of identifying a valid purpose for an administrative medication decision and of establishing the requisite specificity in the medical record; proper consideration of available alternatives; and the detainee’s various procedural rights in connection with the administrative hearing. Recognizing these benefits, courts have often ordered detention facilities to inform counsel of any proposed involuntary medication hearings and to provide' an opportunity for counsel to engage in pre-hearing conference with the detainee’s staff representative. See Humphreys, 148 F.Supp.2d at 953; Weston, 55 F.Supp.2d at 26.
Furthermore, just as a public trial “remind[s] the prosecutor and judge of their responsibility to the accused and the importance of their functions,” United States v. Waters, 627 F.3d 345, 360 (9th Cir.2010), allowing counsel to witness the administrative hearing would remind the hearing’s participants of the important legal rights affected by an involuntary medication determination. And counsel’s observation of the administrative hearing would expedite judicial review of any resulting involuntary medication order, because counsel would not need to resort to discovery to familiarize itself with the administrative proceedings. These benefits more than justify the limited right to counsel sketched above.
As to whether the lawyer must be permitted to participate in the hearing, I *798 would leave that question to be decided on a case-by-case basis. With notice, the attorney will have the opportunity to seek full representation rights from the court on a showing that, in the particular circumstances, there is a need for direct representation so as to preserve the defendant’s rights as to ultimate conviction.
iii. Adequacy of Loughner’s Staff Representative
Quite aside from the exclusion of counsel, the staff representation in this case was a charade, and violated even the majority’s lax due process standards.[16] Throughout the successive administrative involuntary medication hearings, Loughner’s staff representative consistently failed to seek out or present any witnesses, cross-examine or challenge the prison’s witnesses, or advocate in any other meaningful way against forced medication. What he did was sit in the room and, after the hearing concluded, see that Loughner’s appeal form was filed. No more. Such anemic “representation” falls well below the standard demanded by due process and 28 C.F.R. § 549.46(a)(3). See Morgan, 193 F.3d at 266; Humphreys, 148 F.Supp.2d at 953; Weston, 55 F.Supp.2d at 26-27.
Judge Bybee (but not Judge Wallace) recognizes the troubling deficiencies in the representation afforded by Loughner’s staff representative. But he regards them as effectively harmless because, he insists, the district court’s September 28 commitment hearing provided Loughner sufficient opportunity to challenge the prison’s involuntary medication decision. Majority Op. at 764-65.
Not so, as review of the district court’s orders and statements surrounding the September 28 hearing demonstrates. The district court reiterated, in its September 30 order, the position it had taken consistently theretofore — that its only role with respect to the institution’s medication for dangerousness decisions was to review for adequacy of procedures, not to entertain evidence or arguments substantively challenging the determination. The evidentiary aspect of the September 28 hearing was therefore restricted to the specific question whether Loughner’s prior treatment— that is, involuntary medication — would, if continued, likely result in his timely restoration to competency, not whether that treatment was needed to mitigate Loughner’s dangerousness to himself or medically appropriate for that purpose.
Judge Bybee’s suggestion to the contrary has no basis in the sequence of events leading up to the September 28 hearing or in the record of that hearing. First, in its July 1 order reviewing the prison’s Harper I determination, the district court held that Loughner was not entitled to an evidentiary hearing to contest the administrative determination of dangerousness. Instead, the court adopted the holding of Morgan, 193 F.3d at 262-63, and reviewed the prison’s Harper I determination for arbitrariness and compliance with 28 C.F.R. § 549.46. The district court then consistently reaffirmed this holding, stating in its August 30 order that “[t]he defense’s motion for a post-deprivation [judicial] hearing is denied.”
Consistent with the district court’s settled view of its extremely limited role as to the involuntary medication decision, its September 1 order scheduling Loughner’s § 4241(d)(2)(A) commitment hearing gave no indication that the court intended to reverse its prior practice and hold an evi *799 dentiary hearing on the involuntary medication issue. Instead, the court stated quite clearly that “the scope of the [commitment] hearing will be limited to the question of whether an additional period of time should be granted to actually restore the defendant to competency.” Although the court also suggested that the parties should be prepared to state their positions regarding the necessity of scheduling a Sell involuntary medication hearing at some later point, the court never suggested allowing an evidentiary hearing on the prison’s involuntary medication for dangerousness determination as part of its commitment hearing.
During the pre-hearing telephonic conference, the district court further explicated its concern that a Sell hearing may be required where a court orders a pretrial detainee recommitted for restoration through the involuntary administration of psychotropic medication. “I think it is a game changer and a significant event that I — if I do extend him, the purpose for the extension is for restoration,” the court stated, “Knowing that he is being involuntarily medicated, I think it is incumbent upon the court at that point to conduct a Sell hearing.” The court, however, reiterated its decision to focus on the commitment decision and leave the involuntary medication issue for another day, stating: “As I forecast, I think[the necessity of a Sell hearing is] an issue that is timely now and that we have to get to. But the immediate issue is whether there is enough evidence to support an extension on the substantial probability that [Loughner] can be restored. How they restore him and what due process rights he has during that period is a secondary issue. It’s one I intend to get to ultimately. But the immediate issue is just this question of whether an extension is warranted.”
At the September 28 hearing, the district court repeatedly declared its intention to restrict the evidentiary hearing to the commitment issue. Doctor Pietz provided detailed testimony concerning Loughner’s condition and his prospects for restoration. When defense counsel attempted to cross-examine Dr. Pietz regarding Dr. Sarrazin’s diagnosis and its relation to the prescribed antibiotics, however, the government objected on relevance grounds and the court sustained the objection, reminding the defense that “the limited focus here is whether an extension is likely — substantially probable to restore [Loughner].” The court further stated: “I’m well familiar with all of the background reports. I’ve read them myself. You’ll have the opportunity, obviously, at some point when that’s relevant to go over those. But the questions should focus on going forward.”
Doctor Ballenger provided generalized testimony about the likelihood and duration of psychiatric restoration through involuntary medication, gave an opinion as to Loughner’s prospects for restoration based on his medical history and medication regimen, and passed on the propriety of Loughner’s current medication. But when defense counsel attempted to cross-examine Dr. Ballenger regarding the medical appropriateness of Loughner’s involuntary medication regimen, the court chided the digression. “[T]he appropriateness of the treatment is a matter for a Sell hearing or some later hearing,” the court said, “It’s not the subject of this hearing.” Defense counsel responded that “[t]he restoration depends upon the treatment that’s going to be given.” The court, however, persisted in its refusal to expand the scope of the evidentiary hearing, stating that “[t]he question here is whether he’s likely to be restored with an extended commitment to Springfield. I’d like both sides to keep focused on that____I want to focus on the issue of the day, which is whether he’s to be extended and whether the standard of proof is met by the evidence.”
*800 Then, in response to defense counsel’s request for a ruling on its motion to stay Loughner’s involuntary medication, the court responded that its “view continues to be ... that because [the involuntary medication order is] predicated on the ground of dangerousness and really has nothing to do with [Loughner’s] competency to stand trial, that that’s an issue with the Bureau of Prisons and the physicians there, and for good reason.” Following the approach adopted in its July 1 order, the court applied Morgan’s arbitrariness standard and concluded that “there’s no arbitrariness in the third Harper hearing and that the medication going forward, at least of today, is authorized pursuant to the Harper case.” The Court reaffirmed this holding in its written order, which appropriately characterized its review of the administrative Harper III determination as “minimal.”
In short, the district court’s pre-hearing orders, the statements it made during the September 28 hearing itself, and its written post-hearing order, all demonstrate, without doubt, that the evidentiary aspect of the hearing was restricted to a specific question- — -whether Loughner’s current treatment will likely result in his timely restoration, assuming the continuation of involuntary medication. No evidentiary challenge to that treatment was permitted. Instead, following the approach outlined in its July 1 Order, the court conducted a “minimal review” of the prison’s Harper III determination and concluded that the decision was not arbitrary. Nowhere did the court contemplate or suggest a reversal of its previous holdings that Loughner is not entitled to an evidentiary hearing on the issue of his involuntary medication for dangerousness. Indeed, when defense counsel argued that the district court had simply deferred to the Bureau of Prisons on the Harper determination, the district court responded: “What I’ve said is that there is another basis for him being medicated that has nothing to do with me. It has to do with dangerousness.”
In light of the district court’s strict limitations on the scope of its evidentiary hearing and the extraordinary deference it accorded the prison’s involuntary medication decisions, the majority’s conclusion that the September 28 hearing provided Loughner an adequate opportunity to challenge his involuntary medication rests on air, nothing more.
IV. Conclusion
For the foregoing reasons, I would reverse the district court’s order approving Loughner’s commitment for restoration of competency. And although on my view there would be no reason independently to consider the propriety of the September 15 involuntary medication for dangerousness decision at this juncture, were I to do so I would conclude that it was invalid for failure to provide Loughner with the due process and right to counsel protections appropriate to the circumstances. I therefore respectfully dissent.

. Doctor Pietz noted that "medication is the only option for restoring Mr. Loughner to competency” and recommended that Loughner "should be returned to [FMC-Springfield], pursuant to Title 18, Section 4241d for restoration to competency.”

. Before the hearing began, Getchell asked Loughner if he desired any witnesses present for the hearing. Loughner responded, "Just my attorney.” Getchell interpreted this statement as a request for legal representation at the hearing, and so informed the doctors conducting the administrative hearing. Loughner's attorneys were not contacted.

. If Loughner refused the oral solution, he would instead be treated twice daily with 5 mg intramuscular injections of Haloperidol Lactate and 1 mg intramuscular injections of Benztropine.

. Getchell's appeal form failed to specify any grounds for reversal. The procedural defect in the Harper II proceeding may have been brought to the warden's attention through complaints raised earlier in the district court by Loughner's attorneys.

. The majority styles the district court's decision to commit Loughner pursuant to 18 U.S.C. § 4241(d)(2)(A) as an "extension” of his previous commitment under § 4241(d)(1). That is not precisely so. Section 4241(d)(1) authorizes the district court to "commit the defendant” for the purpose of evaluating "whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward.” 18 U.S.C. § 4241(d)(1). Section 4241(d)(2)(A) authorizes the court to commit the defendant “for an additional reasonable period of time until his mental condition is so improved that trial may proceed, if the court finds that there is a substantial probability *782 that within such additional period of time he will attain the capacity to permit the proceedings to go forward.” 18 U.S.C. § 4241(d)(2)(A). So, the purposes of the two periods of commitment are different, and the judicial findings required to trigger them are concomitantly different.

. Sell concerned the involuntary medication of a pretrial detainee on trial competency grounds. 539 U.S. 166, 123 S.Ct. 2174. After finding Sell incompetent to stand trial for various criminal charges, a magistrate judge ordered him committed to FMC-Springfield for the purpose of evaluating whether he would attain the capacity to allow his trial to proceed. Id. at 171, 123 S.Ct. 2174. FMC-Springfield’s medical staff administratively authorized Sell’s involuntary medication on both trial competency and dangerousness grounds. Id. at 171-72, 123 S.Ct. 2174. When Sell filed a motion challenging his involuntary medication, the magistrate who had committed Sell held an evidentiary hearing and also issued an order authorizing Sell’s involuntary medication on both trial competency and dangerousness grounds. Id. at 172-73, 123 S.Ct. 2174. On review of the magistrate’s decision, the district court held that the magistrate's dangerousness finding was clearly erroneous, but further held that involuntary medication was justified on trial competency grounds. Id. at 173-74, 123 S.Ct. 2174. The Eighth Circuit affirmed. Id. at 174, 123 S.Ct. 2174. The Supreme Court assumed that Sell was not dangerous, because the government did not contest the dangerousness issue. Id. at 184, 123 S.Ct. 2174. Focusing on the trial competence justification, the Court developed a four-pronged standard for determining whether involuntary medication is justified on trial competency grounds. Id. at 180-82, 123 S.Ct. 2174. It further held, however, that courts should determine whether involuntary medication can be justified on "alternative, Harper- type grounds," such as dangerousness, before attempting to determine whether involuntary medication is necessary to restore a detainee's trial competency. Id. at 182-83, 123 S.Ct. 2174.

. The majority notes that our decision in United States v. Ruiz-Gaxiola, 623 F.3d 684 (9th Cir.2010), references the district court's decision "order[ing] the government to conduct an administrative hearing pursuant to Harper, in order to evaluate whether involuntarily medicating Ruiz was justified on the alternafive basis that his mental illness rendered him gravely disabled or dangerous to himself or others.” Majority Op. at 750 (citing RuizGaxiola, 623 F.3d at 689). The quoted language, however, comes from the court's factual recitation, and therefore does not even constitute dicta.

. An inmate may, for example, prove significantly more dangerous in prison than he would in a properly equipped mental ward. In United States v. Weston, 206 F.3d 9 (D.C.Cir.2000) (per curiam), for example, the D.C. Circuit overruled the district court's finding of dangerousness, on the basis of expert testimony that the facilities at FMC-Butner were sufficient to prevent the detainee from harming himself or others. Id. at 13. Conversely, a detainee might present a greater danger in the hospitalization context than in pretrial detention, because the therapeutic needs of a facility committed to the inmate’s restoration may dictate a lower degree of isolation than he would receive in the penal context.

. Nor is this a one-time problem. The district court's opinion in Sell, which expressed concern that the government's "claim of dangerousness may ... be a post hoc justification,” noted that Sell’s Notice of Medication Hearing and Advisement of Rights form stated "that the reason for [Sell's] treatment [with antipsychotic medication] was to 'Restore competency to stand trial.’ ” United States v. Sell, No. 4:97-cr-290, 2001 WL 35838455, at *5 (E.D.Mo. April 4, 2001).

. The fair trial concerns associated with government-ordered, pharmacologically-induced sanity may be mitigated by the availability of other evidence pertaining to the insanity defense. See Weston, 206 F.3d at 22 (Tatel, J., concurring) (suggesting that, on remand, the district court should determine whether the combination of psychiatric testimony and video recordings of the defendant in his delusional state would enable defense counsel to mount an effective insanity defense).

. Insisting that § 4241(d)(2)(A) obligates the courts to determine only whether the defendant will become competent to stand trial, the majority holds that the district court was not required to determine prospectively whether the pharmacological means used to effect Loughner's restoration will infringe his right to a fair trial. Majority Op. at 768-69. But nothing in § 4241(d)(2)(A) supports such a restrictive reading. Congress could have used the word "competency” if it so desired, but instead it chose a more inclusive, functionally-focused phrase — "the capacity to permit the proceedings to go forward” — which, in plain terms, encompasses any psychological condition that might prevent a trial from ensuing.

. Of course, on my analysis, the present record would not be the pertinent one with respect to the commitment determination. Instead, the district court would hold a hearing at which both sides would present witnesses addressing the availability of approaches other than medication to alleviate dangerousness.

. I do not mean to suggest that an involuntary medication order must disregard any consideration of a pretrial detainee’s long-term reaction to psychotropic medication. Indeed, we have held that involuntary psychotropic medication may only be considered medically appropriate where the “likelihood and value of the long-term benefits outweigh the likelihood and severity of the long-term harms.” Ruiz-Gaxiola, 623 F.3d at 706. The medical appropriateness inquiry, however, is only triggered after medication is justified for some legitimate governmental purpose (e.g., restoration to trial competency, dangerousness to self or others, etc.). See id. at 703. Unlike the medical appropriateness inquiry, the determination of whether or not medication is justified must be focused on the specific context of confinement — and it is at this stage of the analysis that the short-term nature of a pretrial detainee’s confinement becomes salient. Doctor Tomelleri failed to acknowledge this vital distinction.

. The majority, of course, holds that no judicial hearing was necessary. All the more reason to require that the involuntary medication order include a fairly specific treatment plan, as a treating physician could, with minimal effort, seek modification of an administrative involuntary medication order issued by a member of the same prison medical staff.

. Under my preferred approach, on the other hand, the district court would be required to review the justification for involuntary medication at each commitment hearing. Because pretrial detainees may only be committed for a "reasonable period of time,” to be ascertained in advance by the district court, see 18 U.S.C. § 4241, the provision of regularly recurring commitment proceedings would satisfy the need for periodic review.

. Of course, under my approach, the district court would have determined the propriety of involuntary medication at the commitment hearing and Loughner would have been entitled to representation by counsel.